ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
MATTHEW S. MELAMED (260272)
SUNNY S. SARKIS (258073)
NADIM G. HEGAZI (264841)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
mmelamed@rgrdlaw.com
ssarkis@rgrdlaw.com
nhegazi@rgrdlaw.com

Lead Counsel for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH BODRI, Individually and on Behalf of All Others Similarly Situated, | Lead Case No. 3:16-cv-00232-JST |
| Plaintiff, | **(CONSOLIDATED)** |
| vs. | <u>CLASS ACTION</u> |
| GOPRO, INC., et al., | AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| Defendants. | <u>DEMAND FOR JURY TRIAL</u> |

1

**TABLE OF CONTENTS**

2

**Page**

3 NATURE OF THE ACTION ................................................................................1

4 SUMMARY OF THE ACTION ...........................................................................1

5 JURISDICTION AND VENUE ...........................................................................5

6 CONTROL PERSONS ........................................................................................7

7 BACKGROUND TO THE ACTION ...................................................................8

8 FALSE AND MISLEADING STATEMENTS.....................................................10

9      Defendants Announce 2Q15 Results, Laud Hero4 Session Launch, and Reassure
       Investors on Price Pressure and Channel Inventory .........................................10
10
       In a Series of Analyst and Technology Conferences, Defendants Continued to
11     Falsely Assure Investors that the Company Was Not Experiencing Price Pressure.........16

12     Defendants Slash the Price of Hero4 Session by $100...................................18

13     GoPro Announces Big Miss to 3Q15 Financial Guidance but Stock Price Remains
       Artificially Inflated .....................................................................................19
14
       Defendants Slash the Price of the Hero4 Session by Another $100 to $199, and
15     Hawk Hero4 Session on Discount Marketplace QVC.....................................24

16     GoPro Preannounces 4Q15 Financial Results, Takes Charge to Earnings, and Cuts
       Staff Causing the Stock Price to Further Substantially Decline .......................26
17
   LOSS CAUSATION AND ECONOMIC LOSS FOR EXCHANGE ACT CLAIMS .................31
18
   THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE
19       AND MISLEADING STATEMENTS ...........................................................35

20 CLASS ACTION ALLEGATIONS ....................................................................40

21 APPLICABILITY OF THE PRESUMPTION OF RELIANCE
       (FRAUD ON THE MARKET)......................................................................41
22
   COUNT I ........................................................................................................42
23
       For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All
24     Defendants ...................................................................................................42

25 COUNT II .......................................................................................................44

26     For Violation of §20(a) of the Exchange Act Against the Individual Defendants ...........44

27 PRAYER FOR RELIEF ....................................................................................45

28 JURY DEMAND ..............................................................................................46

1.     Lead Plaintiff Camia Investment LLC ("Plaintiff" or "Camia Investment") alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and, as to all other matters, based on the investigation conducted by and through their attorneys, which included, among other things, a review of GoPro, Inc.'s ("GoPro" or the "Company") United States Securities and Exchange Commission ("SEC") filings, the Company's press releases and conference calls, public statements issued by Defendants, the Company's website and other internet sources, media reports, analyst reports, and industry reports.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities (including options) of GoPro between July 21, 2015 and January 13, 2016, inclusive (the "Class Period"), against GoPro, its founder and Chief Executive Officer ("CEO") Nicholas D. Woodman ("Woodman"), its former Chief Financial Officer ("CFO") Jack R. Lazar ("Lazar"), and its President Anthony J. Bates ("Bates"), for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

## SUMMARY OF THE ACTION

3.     GoPro is a consumer electronics company founded in 2004 that develops mountable and wearable cameras, which it calls "capture devices," and related accessories designed to enable consumers to capture content while engaged in a wide range of activities.  According to GoPro, its products are intended for consumers to capture, manage, and share videos and photos.  As disclosed in its SEC Form 10-K for the fiscal year ended December 31, 2015, the Company's "core products are our HERO line of capture devices."  Sales of the Hero line of cameras accounts for nearly all of the Company's revenue.

4.       On July 12, 2015, the Hero4 Session, GoPro's only new camera and key new product offering for FY15, went on sale to consumers.[1] By that date, Defendants knew that the launch would not meet their expectations.  Indeed, GoPro had revised downward its internal forecast for Hero4 Session sales even before the camera became publicly available due to weak retailer demand.  Regardless, Defendants insisted on building and shipping cameras to meet the earlier, higher sales forecast.  As a result, even as Hero4 Session became publicly available, Defendants were negotiating to cancel purchase orders from suppliers of parts for the camera.

5.       In spite of these facts, when GoPro announced its 2Q15 financial results on July 21, 2015, Defendants credited the contributions from sales of the Hero4 Session for contributing to results that greatly exceeded the Company's previously issued guidance and analyst consensus.  During the investor conference call Defendants hosted to discuss the Company's results, they made false and misleading statements about the contributions that Hero4 Session sales made to the quarter's results and denied risks associated with the failure of Hero4 Session to sell-through to consumers, including that:

- ***[T]he momentum that we are seeing with Session out of the gates, given the fact that we launched the product in July . . . is testament to the strength of GoPro's brand.***

- ***Channel inventory levels both in the US and abroad look healthy.***

- ***We did not experience any noticeable camera pricing pressure during this quarter.***

6.       Contrary to Defendants' statements, the truth, which they knew or recklessly disregarded, was that:

- ***By July 2015, GoPro had already reduced its internal sales forecast for the Hero4 Session due to weak retail demand for the camera.***

- ***The Hero4 Session was sitting on retailers' shelves due to slow sales by retailers to consumers, filling up the channel and preventing further sales.***

- ***Due to Hero4 Session's weak sell-through, Defendants had already begun cancelling and reducing purchase orders placed with suppliers of Hero4 Session's parts.***

---

[1]  Fiscal years are similarly designated as FF[YY].  For example, FY15 means fiscal year 2015. Quarters are designated throughout this complaint in the format [QQ][YY].  Thus, 3Q15 means the third quarter of 2015.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS **3:16-cv-00232-JST**                                                                                                    - 2 -

7.      Investors, who were unaware of the true state of affairs, relied on Defendants' false and misleading statements.  Analysts celebrated the key role played by the Hero4 Session in GoPro's 2Q15 results and 3Q15 expectations.  Accordingly, GoPro's stock price traded at artificially inflated prices, reaching more than $64.00 per share during the Class Period.

8.      Hero4 Session sales continued to deteriorate after July 21, 2015.  Notwithstanding the true facts, Defendants continued to mislead investors during a series of investor presentations and media interviews during September 2015, falsely and misleadingly stating that:

- **GoPro does not discount.**

- **We're in the right price points today.**

- **Sales of the Hero4 Session were going well and improving.**

9.      However, on September 28, 2015 – mere days after Defendants' representations and reassurances about discontinuing, pricing, and Hero4 sales – *Defendants slashed Hero4 Session's price by $100, from $399 to $299, in response to the camera's continued sluggish sales*.

10.      On October 28, 2015, Defendants announced GoPro's 3Q15 financial results, which missed the Company's previously issued guidance and analyst consensus by wide margins and provided disappointing financial guidance for 4Q15.  During the investor conference call to discuss the financial results, Defendants conceded, in contrast to their earlier representations, that:

- **The financial results reflected weak initial sell-through of the Hero4 Session.**

- **Defendants were aware of poor initial sell-through of the Hero4 Session in late July 2015.**

- **Hero4 Session channel inventory exceeded the Company's target levels.**

- **The Hero4 Session's initial price of $399 was too high.**

11.      Nevertheless, during the October 28, 2015 earnings call, Defendants continued to make false and misleading statements, including that the Hero4 Session was now selling at its expected pace and that the Company had not experienced any pricing pressure:

- **Hero4 Session is now selling in line with what we would typically expect for a product at this price point.**

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS **3:16-cv-00232-JST**                                                                                          - 3 -

- *3Q15 ASPs were relatively flat and overall we did not experience any noticeable pricing pressure during the quarter*.[2]

12.     Contrary to Defendants' representations, the true state of affairs, which they knew or recklessly disregarded, was that Hero4 Session sales continued to lag expectations so substantially that Defendants would soon be compelled to reduce its price again.

13.     Analysts and investors reacted negatively to the October 28, 2015 announcement of GoPro's poor results and disappointing outlook.  As a result of Defendants' partial disclosures, GoPro's stock price dropped 15.2% on October 29, 2015 to $25.62, as some of the artificial inflation was dissipated.  However, the stock price remained artificially inflated as a result of Defendants' false statements concerning sales of the Hero4 Session, the lack of price pressure, and stable ASPs.

14.     On December 4, 2015, one month after reassuring investors that the Hero4 Session was finally selling in line with expectations, lauding stable ASPs, and representing an absence of pricing pressure, *Defendants were again forced to cut its price in an attempt to spur sales*.  The second price cut – another $100 reduction, this time from $299 to $199 – meant that the Hero4 Session was now selling at half of its original sales price.

15.     The next day, December 5, 2015, Woodman attempted to jumpstart sales by appearing on the televised home shopping channel QVC, a recognized source of discount products.  Woodman not only pitched the Hero4 Session at the newly reduced price, but also threw in accessories for free to anyone who bought the reduced-price camera.

16.     Shortly after the second price reduction, Defendants admitted that they had not marketed the Hero4 Session at launch.  On December 10, 2015, at an investor conference, a GoPro executive *conceded that Defendants had done "zero marketing" of the Hero4 Session*.

17.     On January 13, 2016, Defendants preannounced GoPro's 4Q15 and FY15 financial results, which missed the midpoint of the guidance issued by Defendants by $90 million.  The preannouncement disclosed that *revenues were reduced by $21 million for price protection-related charges resulting from the December 2015 Hero4 Session price cut* and that *the Company had*

---

[2]     "ASP" refers to average selling price.  GoPro's FY15 Form 10-K, filed February 29, 2016, defines ASP as total revenue divided by unit shipments.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS **3:16-cv-00232-JST**                                                                                      - 4 -

1   *taken a charge of between $30 million and $35 million for excess purchase order commitments*

2   *and excess inventory*.   Defendants also announced that they would cut 7% of the Company's

3   workforce.

4        18.     Analysts lambasted GoPro in the wake of the January 13, 2016 preannouncement.

5   They labeled the stock "total junk," called the Hero4 Session "a problem since its launch in early

6   July," and commented that "a quick recovery seems unlikely."   Investor reaction was so negative

7   that GoPro halted public trading of its stock.   GoPro's stock price fell 14.6% on January 14, 2016,

8   closing at $12.48 per share.

9        19.     On February 3, 2016, Defendants announced and hosted an investor conference call

10   to discuss the Company's 4Q15 and FY15 financial results.   Defendants disclosed that, in contrast to

11   their earlier representations:

12        •     *Hero4 Session sales did not begin to meet expectations until after its price was reduced for a second time to half its initial price in December 2015.*

13

14        •     *The Company would realign its product offering so that the Hero4 Session, the Company's flagship product for FY15, would be demoted to its entry-level camera.*

15

16        •     *Hero4 Session's failure to sell resulted from the fact that it was mispriced.*

17        20.     Analysts were aghast.   They criticized the Company's "complete lack of contrition

18   and regret even in the face of terrible earnings and worse guidance," said that the reality was "worse

19   than feared," and surmised that "inventory levels exiting December were even higher than we

20   previously thought."   The negative investor reaction forced GoPro to temporarily halt public trading

21   of its stock for the second time in less than one month.   In the wake of the February 3, 2016

22   disclosures, the Company's dwindling stock price fell an additional 8.7% to close at $9.78,

23   completing an 85% drop from the artificially inflated Class Period high.

**JURISDICTION AND VENUE**

24        21.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the

25   Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17

26   C.F.R. §240.10b-5.

27

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS **3:16-cv-00232-JST**

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 27 of the Exchange Act, 15 U.S.C. §78aa.

23.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because GoPro maintains its headquarters in this District and many of the acts and practices complained of herein occurred in substantial part in this District.  GoPro's principal executive offices are located at 3000 Clearview Way, San Mateo, California 94402.

24.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

25.     Lead Plaintiff Camia Investment purchased or otherwise acquired GoPro securities at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' alleged misconduct.

26.     Defendant GoPro is incorporated in Delaware and trades on the NASDAQ stock exchange under the ticker symbol "GPRO."

27.     Defendant Woodman is, and was at all relevant times during the Class Period, CEO of GoPro, which he founded in 2004.  Woodman participated in GoPro's earnings calls during the relevant time period, including on July 21, 2015, October 28, 2015, and February 3, 2016. Woodman signed GoPro's Forms 10-Q filed with the SEC on July 22, 2015 and October 29, 2015. Woodman also signed GoPro's Form 10-K filed with the SEC on February 29, 2016.

28.     Defendant Lazar was CFO of GoPro at all relevant times during the Class Period. During the Class Period, Lazar also served as GoPro's Principal Financial Officer and reported directly to Defendant Woodman.  Defendant Lazar participated in GoPro's earnings calls during the relevant time period, including on July 21, 2015, October 28, 2015, and February 3, 2016. Defendant Lazar also signed GoPro's Forms 10-Q filed with the SEC on July 22, 2015 and October 29, 2015, as well as each of the Forms 8-K filed by GoPro during the Class Period.  He was fired from GoPro on February 3, 2016, effective March 11, 2016.

29.     Defendant Bates is, and was at all relevant times during the Class Period, GoPro's President and a director of GoPro's board.  Defendant Bates participated in GoPro's earnings calls during the relevant time period, including on July 21, 2015, October 28, 2015, and February 3, 2016.

30.     The Defendants referenced above in ¶¶26-29 are collectively referred to as "Defendants."  Defendants Woodman, Lazar, and Bates are referred to herein as the "Individual Defendants."

### CONTROL PERSONS

31.     As the senior-most executive officers and/or directors of GoPro, the Individual Defendants were in possession of, and privy to, confidential and proprietary information concerning GoPro, its operations, finances, financial condition, and present and future business prospects before and throughout the Class Period.  Because of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of GoPro's quarterly reports, press releases, and presentations to the market, including to analysts, money and portfolio managers, and institutional investors.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading before or shortly after their issuance, and had the ability and opportunity to prevent their issuance, or cause them to be corrected.  As a result of their possession of, and power to, control such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

32.     As senior executive officers and controlling persons of a publicly-traded company whose securities were registered with the SEC pursuant to the Exchange Act during the Class Period, and were actively traded on the NASDAQ and governed by the federal securities laws during the Class Period, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding GoPro's operations, business and financial statements, and to correct any previously issued statements that became materially misleading or untrue, so that the market price of GoPro's stock would be based upon truthful and accurate information.  GoPro's false and misleading statements and material omissions during the Class Period violated these requirements and obligations.

**BACKGROUND TO THE ACTION**

33.     GoPro competes with camera manufacturers such as Canon, Nikon, Olympus, Polaroid, and Vivitar.  It also faces competition from large diversified electronics companies such as JVC, Panasonic, Samsung, Sony, and Toshiba and specialty companies such as Garmin.  Moreover, analysts have recently identified smartphone companies, such as Apple and Samsung, as competitors.

34.     GoPro's revenue increased exponentially between 2011 and 2013.  In 2011, GoPro's revenue was $234.2 million; in 2012, revenue was $526 million; and in 2013, revenue was $985.7 million.

35.     On June 26, 2014, GoPro commenced its initial public offering ("IPO"), selling 17.8 million shares of common stock at $24.00 per share, which raised approximately $200.8 million for the Company.

36.     On November 20, 2014, less than five months later, GoPro commenced a secondary public offering ("SPO").  The Company offered approximately 1.3 million additional shares of common stock at $75.00 per share.  The SPO raised $93.2 million for GoPro before expenses related to the offering.

37.     GoPro raised a total of more than $293 million in the two 2014 stock offerings.  In addition, Defendant Woodman sold $470.7 million worth of his personal holdings in the Company in 2014.

38.     The majority of GoPro's sales are direct.  GoPro sells directly to large and small retailers in the United States, including big-box retailers such as Amazon, Best Buy, Target, and Walmart, as well as independent specialty retailers and mid-market retailers.  The Company also sells directly to consumers worldwide through its website.  Direct sales comprised 52% and 59% of GoPro's revenue in 2015 and 2014, respectively.

39.     GoPro also sells its products indirectly to more than 50 distributors, which resell GoPro products to retailers in international markets and in the United States.  Indirect sales comprised 48% and 41% of GoPro's revenue in 2014 and 2015, respectively.

40.     The Company recognizes revenue when it receives an order from retailers, online customers, or distributors.  For sales to retailers and distributors, revenue is recognized when a product "sells-in," *i.e*., when the Company sells a product to the retailer or distributor.  Revenue recognition does not require a sale to the end consumer.

41.     The process of a product moving from a retailer or distributor to a consumer is called "sell-through."  The retailer or distributor is referred to as the "channel."  Thus, although GoPro recognizes revenue on a sell-in basis, the ability of the Company's products to sell-through to end consumers is instrumental to its ability to book future revenue.  That is because if the channel is full from prior sell-ins that have not sold-through, retailers or distributors will demand fewer products from GoPro.

42.     Defendants diligently tracked GoPro's sell-in and sell-through data.  Defendants understood the importance of a mismatch between sell-in and sell-through numbers.  In fact, during GoPro's 3Q14 earnings call on October 31, 2014, Defendant Lazar stated that "everyday we look at the sell-through data."  He reiterated the point during the Class Period, stating that Defendants "track this stuff" – sell-in and sell-through – "on a weekly basis."

43.     Indeed, Defendants were so involved in monitoring GoPro's day-to-day operations (including, but not limited to, sell-in and sell-through) that, when the Company's former Chief Operating Officer Nina Richardson resigned before the Class Period, Defendant Woodman told investors that he, Lazar, and Bates would personally assume her role.[3]  On February 5, 2015, Defendant Woodman told investors:

> Nina came to GoPro in 2012 to help us scale operations in product development, and she's been fabulously successful in doing that and more.  More than just a terrific executive and leader, Nina is a terrific human being.  It's been a privilege and a blast to work with her for the past two years.  Going forward Tony, Jack and I will take up the reins for Nina's organization.

44.     On July 6, 2015, GoPro announced its key new product for FY15: the Hero4 Session.  Defendant Woodman touted the Hero4 Session as "the smallest, lightest, most convenient GoPro possible."  According to Defendant Woodman, the "HERO4 Session combines the best of our

---

[3]     A chief operating officer is the person responsible for a company's daily operations, is usually considered the company's second in command, and routinely reports to the company's CEO.

engineering and user-experience know-how to deliver our most convenient life-capture solution." He also noted that the Hero4 Session's one-button design "drastically improves the speed and convenience of capturing life moments as they happen." He concluded, "[i]t's incredible what this little GoPro can capture."

45.     According to a *Financial Times* article published that day, "[t]he company described [the Hero4 Session] as a personal project for Mr. Woodman, who launched the first of GoPro's rugged, portable cameras in 2004, with the first digital camera coming two years later." According to an article published by *Forbes*, also on July 6, 2015, the Hero4 Session had been in development for three years. The following day, Dougherty & Company LLC issued an analyst report, "GoPro Adds Smaller, Lighter Camera to Lineup: the Hero4 Session," which stated that, according to Defendant Woodman, the Hero4 Session was meant to expand GoPro's reach to new users that previously felt like GoPro's other cameras were "too technical."

46.     Retailers began selling the Hero4 Session to consumers on July 12, 2015. For retail sales to begin by then, it was necessary for GoPro to have already sold the Hero4 Session to retailers or distributors weeks earlier, *i.e.*, before the end of June 2015. In other words, GoPro had already sold-in the Hero4 Session weeks before July 12, 2015, for sell-through to begin on that date.

### FALSE AND MISLEADING STATEMENTS[4]

Defendants Announce 2Q15 Results, Laud Hero4 Session Launch, and Reassure Investors on Price Pressure and Channel Inventory

47.     <u>False and Misleading Statement</u>:  On July 21, 2015, after the market closed, GoPro issued a press release announcing its 2Q15 financial results. The reported financial results beat forecasted revenue and earnings estimates by a wide margin and, among other things, falsely stated that GoPro was currently experiencing terrific sales momentum from its core products.

---

[4]     Paragraphs in this section containing false and misleading statements are prefaced by "<u>False and Misleading Statement</u>," and the primary statements alleged to be false and misleading in such paragraphs are bolded and italicized.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GoPro Announces Second Quarter 2015 Results**

**Revenue of $420 Million, Up 72% Year-Over-Year**
**Non-GAAP EPS of $0.35, Up from $0.08 a Year Earlier**
**GoPro Now Sold in More than 40,000 Stores Worldwide**

\*        \*        \*

"I couldn't be more proud of our aggressive pace of innovation.  With the introduction of HERO4 Session and HERO+ LCD, we've launched five new cameras in the past 10 months, exciting both new and existing customers and contributing to strong second quarter results," said GoPro Founder and CEO, Nicholas Woodman. "*Our core business is enjoying terrific momentum as we charge forward into attractive adjacent markets*."

48.      <u>False and Misleading Statement</u>:  The same day, GoPro hosted an earnings call for analysts and investors to discuss its 2Q15 financial results.  Defendants Woodman, Lazar, and Bates participated in the call, along with Jeff Brown, GoPro's Vice President of Communications. Defendant Lazar provided 3Q15 financial revenue guidance of between $430 million and $445 million in revenue, earnings per share ("EPS") guidance of between $0.29 and $0.32, and gross margins between 45.5% and 46.5%, based on the false statement that channel inventory levels were healthy.

[Lazar:]  After a great first half of the year, we're also quite optimistic about the remainder of 2015. *Channel inventory levels both in the US and abroad look healthy*.

Accordingly, *we anticipate revenue of between $430 million and $445 million for the third quarter*. . . .   For the third quarter *we anticipate our gross margin will be 46%, plus or minus 50 basis points*, up from the 44.5% in the prior-year comparable quarter.

*[W]e anticipate EPS to be in the range of $0.29 to $0.32*.

49.      <u>False and Misleading Statement</u>:  During the July 21, 2015 call, Defendant Lazar falsely stated that GoPro had not experienced any pricing pressure for its cameras, including the Hero4 Session, during 2Q15.  Despite increases in inventory, Defendant Lazar assured investors that worldwide inventory levels remained healthy:

[Lazar:]  *We did not experience any noticeable camera pricing pressure during this quarter*.

\*        \*        \*

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS **3:16-cv-00232-JST**                                                                                                    - 11 -

1    Inventory increased by $55.2 million sequentially, and turns were 4.7.[5]  The
2    substantial portion of increased inventory relates to new products we are bringing to
market and our efforts to prepare for the holiday season.

3    **Channel inventory levels both in the US and abroad look healthy**.

4    50.    <u>False and Misleading Statement</u>:  During the July 21, 2015 call, analysts asked

5 whether GoPro's introduction of the Hero4 Session mid-year, as opposed to closer to the holiday

6 season, was risky because the timing of the launch was off-cycle.  In response, Defendant Woodman

7 assured investors that due to the strength of its brand, GoPro was capable of effectively and

8 successfully launching new products at any time of the year, and identified the purported momentum

9 that GoPro was currently experiencing with Hero4 Session as evidence of that capability:

10    [Woodman:]  I think that the momentum that we are seeing with Session ***out of the***
11    ***gates, given the fact that we launched the product in July . . . is testament to the***
***strength of GoPro's brand, and that we don't have to fortunately wait for a fourth***
12    ***quarter holiday season to launch a product and get a strong positive response from***
***the marketplace***.

13    Thanks to the strength of our global distribution network and strength of the
14    brand, ***it seems that we are capable of launching a product at any time of year.***
***We're happy with what we are seeing***.

15    51.    Investors reacted positively to GoPro's 2Q15 results and 3Q15 guidance.  Analysts

16 specifically credited Defendants' statements about the Hero4 Session.  On July 21, 2015, Piper

17 Jaffray issued a report entitled "Raising Estimates & PT To $72 Following Strong Q2 & Robust

18 Outlook; Reiterate OW."  The report, based upon the Company's positive comments on July 21,

19 2015, increased the FY15 EPS from $1.72 to $1.90 and increased the price target for 3Q15 from

20 $68.00 to $72.00, given GoPro's "'beat & raise'" story.[6]

21

22    We are reiterating our Overweight rating and raising our price target from
23    $68 to $72 following GoPro's strong Q2 earnings report in which sales were up 72%
and EPS was up 315% Y/Y.

24    More importantly, ***the ongoing robust growth of the brand was underscored***
25    ***by management's Q3 guidance in which sales are forecasted at $435M- $445M,***

26    [5]   Inventory turns (or turnover) is the number of times inventory cycles per year and is often
calculated by dividing annual cost of sales by the price of current inventory.

27    [6]   "Beat & raise" stocks are those for which companies not only beat quarterly forecasts but
28 increase (or raise) forward-looking guidance as well.

1     *significantly above our former $386M estimate and the Street's $401M.  Q3 EPS is now forecasted at $0.29-$0.32 (Street: $0.22)*.

2

3     52.    On July 22, 2015, J.P. Morgan issued a report entitled "2Q15 Results: Positive Momentum Continues," which reiterated GoPro's confidence in demand for, and sales of, the Hero4 Session, including strong ASPs driving margin growth:

5     *GoPro delivered another solid beat-and-raise*, demonstrating resilient growth in a typically quiet quarter.  Pull-through momentum for Hero 4 Black and Silver coupled with the off-cycle HERO+LCD drove camera units up 93% y/y with elevated margins owing to an increase in ASPs.  *3Q15 guidance beat, driven by management's confidence in the 50% smaller Hero Session and new initiatives* . . . .

9     53.    After GoPro's 2Q15 reported financial results and increased financial forecast, GoPro stock traded at artificially inflated prices above $60.00, reaching a Class Period high of $64.74 on August 10, 2014.

12     54.    <u>Reasons Why Statements in ¶¶47-50 Were Knowingly or Recklessly False and Misleading</u>:  Each of Defendants' July 21, 2015 statements regarding: (i) current sales momentum; (ii) the absence of any pricing pressure during the quarter; and (iii) 3Q15 revenue guidance was materially false and misleading because Defendants knew or recklessly disregarded, and failed to disclose the following facts, including that, even before the Hero4 Session launched publicly, the Company had already reduced its internal sales forecast for the camera:

18     (a)    In early summer 2015, the Company's operations and supply executives, including GoPro's Worldwide Operations Supply Demand Program Manager, Alonso Alcantar, circulated internally a sales forecast for Hero4 Session to relevant staff members.  Based on those sales forecasts, the Company caused purchase orders for the various Hero4 Session components to be sent to the Company's suppliers, including Ambarella.

23     (b)    At GoPro, it was typical for the first eight weeks of the forecast to be generally treated as locked in, meaning that GoPro was committed to procuring enough components to fulfill requirements to meet that forecasted demand.  For example, if it had been forecasted that 100 cameras would be sold within the next eight weeks, purchase orders for enough components to build 100 cameras would be submitted to the Company's suppliers.  If GoPro forecasted too high and sold only 50 of the 100 cameras, then the future forecast for camera manufacturing should have

1  been reduced by 50 cameras because there were already 50 cameras on hand and component orders

2  should have been cancelled or reduced because of materials already on hand that had not been sold.

3          (c)     Before the Hero4 Session was publicly launched in July 2015, the internal

4  sales forecast for the Hero4 Session was reduced.  It was thus known early in the Class Period that

5  response to the weaker than expected demand had resulted in a reduced internal sales forecast for

6  Hero4 Session.   The Company's operations team nevertheless continued to build to meet a

7  production schedule that was based on the earlier, higher forecast of Hero4 Session sales despite the

8  indication from the reduced sales forecast that GoPro would not need as many of the cameras as it

9  was building.

10          (d)     The poor sales demand of the Hero4 Session made it necessary to cancel

11  purchase orders with suppliers that were placed in early summer 2015.  Beginning as early as August

12  2015, and continuing through November 2015, GoPro was negotiating with some of the Company's

13  suppliers, because GoPro did not want to pay for cancelled purchase orders.  However, some of the

14  components had already been made.  Defendants later conceded that initial sell-through of the Hero4

15  Session was weak and many components had to be written-off.  *See, e.g.*, ¶¶66, 82, 88.

16          (e)     The fact that GoPro cancelled or reduced orders with suppliers in the summer

17  of 2015 is corroborated by the Company's major chip supplier Ambarella, which, in September

18  2015, publicly suggested that order demand from GoPro was weak.  Specifically, GoPro's major

19  supplier Ambarella would report on September 1, 2015, that its own growth rate was expected to

20  decelerate from 79% year-over-year to 37% year-over-year for its October 2015 quarter, due to

21  weakness in wearable camera sales.

22          (f)     In addition to known weak sales and demand, resulting in order reductions and

23  cancellations, and despite heavy reliance on sales of the Hero4 Session to drive 3Q15 revenue

24  growth, GoPro failed to disclose that it had not committed sufficient – indeed, any – marketing

25  support when it launched the product.  The Company would later admit that marketing support for

26  the Hero4 Session at the time of its launch was "zero" and that the decision not to commit any

27  marketing support was a bad idea.  *See*, *e.g.*, ¶¶79-80.

28

1        (g)     Contrary to Defendants' assertions, GoPro was in fact experiencing "pricing

2 pressure," *i.e.*, pressure to reduce sales prices, in 2Q15 because the Hero4 Session was known to be

3 priced too high at $399 and was not selling-through the channel, resulting in component order

4 cancellations and reductions.  Moreover, while ASPs may not have actually declined during 2Q15,

5 Defendants failed to disclose that the Hero4 Session was not selling-through retail or distributor

6 channels.  The ASPs were thus artificially inflated and did not reflect the fact that GoPro simply had

7 not yet succumbed to pressure to reduce the selling price to combat slow sales which it would do in

8 September 2015 and again in December 2015.   Indeed, in September 2015, Defendants

9 acknowledged that the Hero4 Session had not met sell-through expectations and acknowledged that

10 it only started to meet those expectations in December 2015, when its price had been halved to $199,

11 which Defendants admit resulted in declining ASPs.  ¶¶66, 70, 91.

12        (h)     Finally, because the Company's purported risk disclosures, which remained

13 fixed even as the sales risks changed for the worse, described mere possibilities while failing to

14 acknowledge that they had already begun to transpire, were therefore themselves false, misleading,

15 and inadequate.[7]  For example, Defendants identified risks associated with accurately forecasting

16 inventory needs, tracking the level of product inventory in the channel, overestimating future sales,

17 carrying excess product and component inventory, or distributors decreasing product orders.

18 However, as set forth above and as later admitted by Defendants, each of these risks had already

19 materialized.  *See, e.g.*, ¶¶54(c), 66.  Defendants had already reduced GoPro's internal forecast of

20 future sales for Hero4 Session and excess Hero4 Session inventory was already a problem.  *Id.*

21        (i)     In light of the above known undisclosed facts, and because GoPro's forecasted

22 financial growth and results were based substantially on sell-in and sell-through of the Hero4

23 Session (¶48), the Company's 3Q15 financial guidance did not have a reasonable basis.

24

25

26    ———————————

[7]   During the July 21, 2015 conference call, Defendants referred investors to risk factors to GoPro's

27 future financial performance disclosed in the Company's annual report on Form 10-K for the fiscal
year ended December 31, 2014, which was filed more than five months before the first alleged

28 misrepresentation.

<u>In a Series of Analyst and Technology Conferences, Defendants Continued to Falsely Assure Investors that the Company Was Not Experiencing Price Pressure</u>

55.     <u>False and Misleading Statement:</u>  On September 9, 2015, GoPro presented at the Citi Global Technology Conference in New York City, during which Defendant Lazar falsely lauded GoPro's ASP stability and assured investors that its product prices were stable because ***"we don't really discount"***:

> [Analyst:] So, in terms of ASPs, they have been fairly stable over the past of your history since you were public as a company. I think it has actually increased before you were public.  Do you think long-term ASP is going to remain stable as you manage your portfolio . . . .
>
> *                 *                 *
>
> [Lazar:] So, your comment to start, Jeremy, was spot-on. **We really haven't seen any ASP erosion**.  Maybe it's up or down 1% or 2% a quarter type thing, but it never really varies that much because, as you know, ***we don't really discount***.

56.     <u>False and Misleading Statement:</u>  On September 17, 2015, GoPro presented at the Stifel Consumer Conference in New York City, during which Defendant Lazar again falsely lauded the ASP stability of GoPro products, asserting he saw no reason why such stability should not continue because GoPro's products, including the Hero4 Session, were currently at the right price points:

> [Lazar:] ***The overall ASPs for the Company have actually remained pretty steady***. I think there's a pretty good spot.  I think we're addressing good price points right now.
>
> ***[W]e believe that people buy a GoPro, and they are generally less price-sensitive than other products out there*** . . . . ***I don't see any reason why it shouldn't continue***, if we do a good job of actually delivering value in these products.
>
> ***So I'm actually pretty optimistic that we're in the right price points today.  And the mix will matter.  But, right now, the mix is pretty good.***

57.     <u>False and Misleading Statement:</u>  On September 22, 2015, CNBC interviewed Defendant Woodman on "Fast Money Halftime Report."   During the interview, Defendant Woodman falsely stated that sales of the Hero4 Session were currently going really well, and, in fact, "improving":

> [Interviewer:]  I know on the street [there's] a lot of interest on Hero4 Session, the new camera.  How is that camera performing?  Are sales living up to your expectations there?

1    [Woodman:] *Yeah, it's going really well* . . . you have to remember we only

2    came out with this product two months ago. *So it's going well and sales are improving as we move towards the holiday season.*

3    58.    <u>False and Misleading Statement:</u>  During the same September 22, 2015 interview,

4    CNBC also asked Defendant Woodman about Ambarella's September 1, 2015 conference call

5    disclosure that its wearable camera business segment would be down both sequentially and year-

6    over-year.  The interviewer understood that disclosure to suggest that GoPro ordered too many chips

7    from Ambarella earlier in the year, or did not order as many as expected for 3Q15 and 4Q15.

8    Analysts and investors knew that Ambarella was GoPro's sole supplier of chips.   Defendant

9    Woodman falsely rejected that implication:

10   [Interviewer:]  I know the Street looks at Ambarella as a tell on GoPro. So when I

11   was on Ambarella's conference call and they come out and they say listen, our wearable camera business is going to be down year over year. What analysts and investors think is ok, well, GoPro must not be ordering as many chips from

12   Ambarella. . . .  Is that accurate?

13   [Woodman:] *That's not accurate*.

14   59.    During the same interview, Defendant Woodman falsely stated that Ambarella's

15   September 1, 2015 disclosures should not be understood to mean that GoPro would not launch any

16   new products in 4Q15 as it had successfully done in seasons past:  "It doesn't necessarily mean

17   we're done for the fourth quarter and we don't have new products."

18   60.    <u>Reasons Why Statements in ¶¶55-58 Were Knowingly or Recklessly False and</u>

19   <u>Misleading</u>:   Each of the September 2015 statements set forth above in ¶¶55-58 concerning:

20   (i) pricing and the lack of ASP erosion; (ii) the current status of Hero4 Session sales; and

21   (iii) whether GoPro had reduced its chip orders from Ambarella were materially false and misleading

22   because Defendants knew or recklessly disregarded, and failed to disclose the following facts:

23   (a)    As detailed in ¶54(c)-(e), in July 2015, Defendants had already reduced the

24   internal sales forecast for its newly launched Hero4 Session before September 9, 2015, due to weak

25   demand, and had already begun cancelling and reducing purchase orders that GoPro had placed with

26   its product suppliers due to the weak demand and sell-through of Hero4 Session.

27   (b)    As detailed in ¶¶54(g), 70, 91, the Hero4 Session, which was initially priced at

28   $399, was not selling in accordance with expectations, and was not offered at the right price

1  point.  In fact, Defendants would announce on September 28, 2015, that GoPro would sharply cut

2  the price of the Hero4 Session by $100, to $299, indeed eroding ASP by 25% for each Hero4

3  Session to be sold, due to the camera's failure to sell-through to consumers and GoPro's resulting

4  inability to make additional sales into retailer and distributor channels.  ¶61.

5              (c)      Indeed, Defendants failed to disclose that sales of the Hero4 Session

6  continued to lag the Company's and the market's expectations so significantly that they would need

7  to cut the price a second time, again by $100, right in the middle of the holiday season, and that this

8  second price cut would further diminish ASPs.  *See, e.g.*, ¶¶75, 92.

9  Defendants Slash the Price of Hero4 Session by $100

10         61.    On September 28, 2015, just days after representing that the Hero4 Session was at the

11  right price point, that GoPro customers were not price sensitive, and that "we don't really discount,"

12  Defendants issued a press release, "GoPro Rounds Out 2015 Lineup with new Hero+ Camera,"

13  announcing that they had slashed the price of the Hero4 Session by 25%, from $399 to $299, to

14  increase sell-through of the camera to consumers and decrease retailer inventory:

15      **GoPro Rounds out 2015 Lineup with new HERO+ Camera**

16      **New Lower-Cost GoPro makes Capturing and Sharing Engaging Life-Content**
17      **more Accessible $199.99 HERO+ adds Wi-Fi Connectivity for Quick Mobile**
    **Sharing of Great Moments** *HERO4 Session Now Available for $299.99*

18         62.    The sharp, surprising price cut of the Hero4 Session had a significantly negative

19  impact on GoPro's financial condition and prospects.  As later revealed, due to the Hero4 Session

20  price reduction, GoPro was forced to offer its retailers and distributors price protection[8] and market

21  development funds ("MDF"),[9] which would negatively affect the Company's bottom line, EPS, and

22  gross margins.

23

24

_____

25  [8]    Price protection is an agreement between a company (seller) and a buyer, such as a retailer.  In
26  the case of a product price decrease, the company will credit or rebate the difference in price
between the former, high price and the new, lower price for all the inventory on hand that the buyer
purchased at the higher price.

27  [9]    MDF is utilized by a company to make funds available to a distributor, or indirect seller, to raise
28  awareness about a company's product(s).

63.     On October 7, 2015, shortly after the Hero4 Session's price cut, analysts at Morgan Stanley issued a report entitled "Session Disappointment Indicative of Poor User Experience Improvements," which noted that channel checks on the Hero4 Session were decidedly more negative than for other GoPro cameras: "Commentary by [GoPro] management at recent investor events confirm that Session has been a difficult sell at the same price point of its historically favorite HERO4 Silver model."

64.     Between October 6, 2015 and October 8, 2016, GoPro stock price declined from a close of $30.65 to a close of $27.60, on volume significantly above the Class Period average.

GoPro Announces Big Miss to 3Q15 Financial Guidance but Stock Price Remains Artificially Inflated

65.     On October 28, 2015, after the market closed, GoPro issued a press release announcing that the Company's 3Q15 financial results missed its previously issued guidance and analysts' consensus revenue and earnings forecasts by up to $45 million and EPS by $0.07. Specifically, in the October 28, 2015 press release and conference call, Defendants announced 3Q15 revenues of $400.3 million, compared to GoPro's guidance range of $430 million to $445 million provided on July 21, 2015, and EPS of $0.25, substantially below GoPro's guidance range of $0.29-$0.32.

66.     Later the same day, the Company held a conference call to discuss the 3Q15 financial results.  During the call, hosted by Defendants Woodman, Lazar, and Bates, Defendants admitted: (i) Hero4 Session was priced too high; (ii) as early as July 2015, sales and sell-through trends of the Hero4 Session were unfavorable; (iii) the Company had failed to commit sufficient marketing funds to Hero4 Session; and (iv) the $100 price cut on Hero4 Session resulted in a $19 million hit to the Company's revenue.

> [Woodman:]   I want to explain three factors we believe led to our underperformance for the third quarter.  Factor One, *initial sellthrough of HERO4 Session was weak*.  In retrospect, we believe *we priced the product too high at $399* . . . .
>
> *                *                *
>
> Factor Two, after receiving strong feedback from consumers and retailers, combined with *our recognition that Session's underperformance was likely to continue, we took action to price adjust Session to $299 in September*.  This

resulted in $19 million of price protection and MDF which is reflected in our reduced revenue for the quarter.

\*     \*     \*

Factor Three, marketing.  Looking back, *we now believe we underfunded marketing* in the second and third quarters of this year which *impacted demand*. . . .

\*     \*     \*

[Lazar:]  *As far as the sellthrough reduction, I think what we saw were some unfavorable trends from late July, early August through the August, September time frame*.

67.     Defendants further disclosed that channel inventory of the Hero4 Session – the cameras sold-in to retailers and distributors but not sold-through to consumers – exceeded target levels.  Defendant Woodman revealed that "we are heading into a fourth quarter with channel inventory levels that are at our targets, with the exception of Session, and, to a lesser extent, the HERO+ LCD, which are higher."

68.     When questioned about the inventory levels, Defendant Lazar reiterated the message that the Hero4 Session channel inventory was above target levels.

[Analyst:] *Can you help us quantify the impact of the channel inventory that you referenced*?  I think it would be helpful if you maybe tell us how many weeks of inventory you saw in the channel a year ago versus where that is today?  And then how many weeks of inventory you think you might be exiting the fourth quarter with?

[Lazar:] Just as a reminder, we are at -- *with the exception of Session and HERO+ LTD, to a much lesser extent HERO+ LCD, we are at our target levels right now*.  We have not disclosed what our target levels are, but I will make a comment on this in that I personally believe that we are looking at least a month of inventory difference in the channel.

69.     <u>False and Misleading Statement</u>:  Notwithstanding these disclosures, Defendants continued to make false and misleading statements concerning the Hero4 Session.  During the call, Defendant Lazar issued GoPro's financial guidance for 4Q15 including revenue between $500 million and $550 million and EPS of $0.35-$0.45, which, though below expectations, was knowingly false.

[Lazar:] [W]e anticipate *[4Q15] revenue of between $500 million and $550 million*.  At the midpoint of our guidance, this represents a decrease of 17% year-over-year for the fourth quarter and an increase of 23% for the full year of 2015.

We expect our product and channel mix to remain favorable and for our gross margins to continue to be above our long-term target of 42% to 44%. For the fourth quarter, *we anticipate our gross margin will be 46%, plus or minus 50 basis points* at the midpoint.

\*       \*       \*

[W]e anticipate EPS to be in the range of $0.35 to $0.45.

70.    <u>False and Misleading Statement</u>:  Defendant Woodman falsely stated that Hero4 Session sales were currently performing in line with expectations for a product priced at $299. Defendant Lazar falsely stated that GoPro's inventories, while growing, were "in line" with expected demand, and that ASPs continued to remain flat and stable:

[Woodman:] Since the price adjustment, we've seen an increase in sellthrough as a percentage of product mix. *Session is now selling in line with what we would typically expect for a product at this price point*. Translation, while it got off to a slow start, *Session is now performing as a full-fledged member of the HERO4 lineup*.

\*       \*       \*

[Lazar:] *Q3 ASPs were relatively flat and overall we did not experience any noticeable pricing pressure during the quarter*.

71.    On October 29, 2015, after GoPro's release of 3Q15 financial results and its conference call, Wedbush published a report discussing GoPro's large revenue and earnings miss and lower-than-expected guidance and criticizing the Company for not pre-announcing the huge miss:

- **GoPro had a much worse-than-expected Q3 driven by HERO4 Session**. *Revenue was $400 million, versus our estimate of $455 million, consensus of $434 million, and guidance of $430 – 445 million*.

- *Management attributed the miss to initial weak sell-through for the HERO4 Session due to a price point that was too high*. The second factor was the $100 price cut for Session, which resulted in $19 million of price protection and marketing development funds.

- *The third factor was underfunded marketing, which hurt demand*.

- *In our view, management made a mistake in not pre-announcing the negative results*.

- **Q4 guidance also disappointed, partly a reflection of high channel inventory for Session and HERO+ LCD**. Q4:15 guidance is for revenue of $500-550 million and non-GAAP EPS of $0.35-0.45, vs. our prior estimates of $700 million and $1.06, and prior consensus of $690 million and $0.82.

- **Management has made a number of missteps in recent months, most notably by not disclosing earlier in the year the lack of a full product refresh by year-end, as well as a poorly executed launch for the HERO4 Session.** *With that said, we believe that the recent bad news has now been fully priced into the stock* . . . .

72. As a result of the disclosures on October 28, 2015, GoPro's stock price declined 15.2% from a close of $30.21 on October 28, 2015, to a close of $25.62 on October 29, 2015, on a volume of more than four times the Class Period average. GoPro securities, however, continued to trade at artificially inflated prices.

73. <u>Reasons Why Statements in ¶¶69-70 Were Knowingly or Recklessly False and Misleading:</u> The statements set forth in ¶¶69-70 above concerning (i) the current status of Hero4 Session sales and (ii) the stability of ASPs and absence of pricing pressure during the quarter were each materially false and misleading because Defendants knew or recklessly disregarded, and failed to disclose the following facts:

(a) Sales of Hero4 Session were not performing as one would expect for a product at its reduced price point, but rather continued to underperform expectations, which would result in yet another price cut from $299 to $199 – half of GoPro's original price point of $399. ¶75.

(b) The Company was in fact experiencing "pricing pressure." Despite substantial price reduction in September 2015, customers were still not purchasing the Hero4 Session in line with expectations as demand remained weak. Moreover, contrary to the statements that ASPs were flat, Defendants failed to disclose that ASPs were being negatively affected by the Hero4 Session price cut. Indeed, Defendants knew the camera was still not meeting sales expectations and that an additional price cut was likely necessary, if not imminent. *See*, *e.g.*, ¶¶75, 91.

(c) In light of the above known facts, and because the Company's forecasted financial growth and results were based substantially on sell-in and sell-through of the Hero4 Session (*see* ¶48), the Company's 4Q15 financial guidance did not have a reasonable basis.

(d) Also in light of the above known facts, the Company's risk disclosures, which remained fixed even as the risks changed, disclosed risks that had already begun to transpire and were therefore themselves misleading and inadequate. During the October 28, 2015 conference call,

1    Defendants again referred investors to the risk factors to GoPro's future financial performance

2    disclosed in the Company's annual report on Form 10-K for the fiscal year ended December 31,

3    2014, which Defendants filed more than eight months before the conference call.  The risks

4    purportedly disclosed had already materialized.  For example, Defendants disclosed the risks of

5    forecasting inventory needs and "accurately track[ing] the level of product inventory in the channel

6    to ensure we are not in an over or under supply situation."  Similarly, Defendants disclosed the risk

7    of "overestimat[ing] future sales" and "carrying excess product and component inventory," and

8    warned that if sales did not occur rapidly enough to clear the sell-in channel, "our distributors will

9    decrease the size of their future product orders."  By October 28, 2015, however, Defendants had

10   admitted that Hero4 Session sell-through was weak and channel inventory of the Hero4 Session

11   exceeded targets.  Further, the Company never warned that they would misrepresent the current state

12   of demand for the Company's products or omit the material facts and conditions set forth above.

13          74.     On December 2, 2015, GoPro presented at the Nasdaq OMX Investor Program in

14   London, UK, during which Defendant Lazar admitted they didn't launch the Hero4 Session "the way

15   in which we should have," including by doing so at a "premium price point to start."  Nevertheless,

16   he continued to praise the Company's average sales prices, which "have either been relatively flat or

17   up."

18          [Lazar:]  When I look at the product itself, and *you just look at the ASPs over the*
            *last few years, you know they have either been relatively flat or up*.  And so I think
19          there is a pretty good brand awareness for GoPro.  *I think the products are pretty*
            *well received*.
20
            I think our risk is making these products correctly. *Clearly we didn't launch*
21          *Session the way in which we should have*, and that was actually the risk.  It wasn't
            that we were getting – we were losing competitive share.  It was simply – or that we
22          had to lower the price.

23          *We did eventually end up lowering the price for this because we hit a*
            *premium price point to start*.  I believe it is a premium product.  We believe this is
24          something we want to get in the hands of everybody out there.  And so that was the
            reason we chose to lower the price, make it more accessible as we go into the holiday
25          season.

26

27

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS **3:16-cv-00232-JST**                                                                                    - 23 -

<u>Defendants Slash the Price of the Hero4 Session by Another $100 to $199, and Hawk Hero4
Session on Discount Marketplace QVC</u>

75.     On December 4, 2015, merely two days after Defendant Lazar reassured investors that ASPs over the last few years had remained relatively flat or up, Defendants issued a press release entitled "$199 Hero4 Session is a Game Changer," announcing that it had slashed the price of Hero4 Session by another 33%, from $299 to $199.  The camera, which the Company had debuted at $399 as an addition to its premium offerings, was now being offered to customers at 50% of its initial price:

**$199 HERO4 Session is a Game Changer**

**Capturing Immersive 'WOW' GoPro Footage of your Favorite Activities is Now Easier than Ever**

\*          \*          \*

GoPro, Inc., is making it easier than ever to self-capture and share 'wow' footage of your ***favorite activities with the newly priced $199 HERO4 Session***.

76.     After news of the second major price cut, *Fortune* published an article, "GoPro Drops Price of Hero4 Session for Second Time," in which it concluded: "with today's announcement, it's clear the first price decrease failed to provide the spark Woodman was expecting."  GoPro stock declined from a close of $18.93 on December 3, 2015, to a close of $18.00 on December 4, 2015, on substantially increased volume of more than 11 million shares traded.

77.     On December 5, 2015, Defendant Woodman appeared on the televised home shopping channel QVC, a recognized source of discount products, to sell the Hero4 Session at the newly reduced price of $199.  Defendant Woodman not only pitched the Hero4 Session at its new price, but threw in a tripod and other accessories for free as giveaways to further incentivize customers to purchase the camera.  During the 20-minute segment, GoPro reportedly sold more cameras on QVC than during the three days of the Black Friday shopping period (*i.e.*, the Friday, Saturday, and Sunday following Thanksgiving), widely considered to be the biggest shopping event of the year.  Analysts regarded Defendant Woodman's QVC appearance as an act of desperation and as a signal that demand for GoPro cameras was softening.  ¶81.

78.     Following Defendant Woodman's QVC appearance on Saturday, December 5, 2015, GoPro's stock price fell again on Monday, December 7, 2015, by an additional 2.7%, to close at $17.51.

79.     On December 9, 2015, GoPro presented at the Barclays Global Technology Conference in San Francisco, California, during which Defendant Woodman conceded that Defendant's July 21, 2015 statement that GoPro's brand power enabled it to successfully launch a product off cycle – success which was purportedly already evidenced by the then-current momentum – was false. ¶50. According to Woodman, GoPro "didn't put enough marketing behind it" and "gaffed" – *i.e.*, made a massive mistake on – "the pricing":

> [Analyst:] [I]f you go back and you think about the timing of that launch, what is the lesson learned? . . .
>
> [Woodman:] ***We gassed [sic] it***. . . . And as it turns out, the timing of the year that we launched it wasn't great for getting attention and ***we didn't put enough marketing behind it***. And as a result – and ***we gassed [sic] the pricing at $399 and we've acknowledged that***.[10]

80.     On December 10, 2015, GoPro presented at the Wedbush Securities California Dreamin' Technology Consumer Management Access Conference in Santa Monica, California. GoPro VP of Communications Jeff Brown admitted that the Company had done no marketing of the Hero4 Session at launch: "***Doing zero marketing behind this***," the Hero4 Session launch, "***just on the assumption that everybody is going to go buy it – bad idea***."

81.     On December 14, 2015, *CNN Money* published an article entitled "Is GoPro doomed? Stock has been a huge dog," which noted "growing concerns that GoPro's products may just be a passing fad – the high tech equivalent of a Pet Rock or Cabbage Patch kid." Concerning Woodman's QVC appearance, the article opined: "That may seem like an act of desperation." The article also noted the resulting downgrades from Citi and Morgan Stanley, which caused the stock to drop 10%, from $19.15 at close on December 11, 2015, to $17.31 at close of the next trading day, December 14, 2015.

---

[10]   The transcription of "gaffed" as "gassed" appears to be a mistake.

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS **3:16-cv-00232-JST**                                                                                                    - 25 -

<u>GoPro Preannounces 4Q15 Financial Results, Takes Charge to Earnings, and Cuts Staff Causing the Stock Price to Further Substantially Decline</u>

82.     On January 13, 2016, GoPro issued a press release preannouncing its preliminary financial results for 4Q15, including $435 million in revenue, which was far below the Company's initial guidance of $500 million to $550 million.  In addition, GoPro announced that it would cut its workforce by 7% (105 employees) and take a $30 million charge to earnings to account for excess purchase commitments and inventory, and obsolete tooling.  GoPro also announced a $21 million reduction in revenue for price protection related charges.  Notably, Defendants attributed the results to a slowdown in sell-through, particularly in the first half of the quarter, *i.e.*, from October 1, 2015 to November 15, 2015.

> GoPro expects revenue to be approximately $435 million for the fourth quarter of 2015 and $1.6 billion for the calendar year.

> **Fourth quarter revenue reflects lower than anticipated sales of its capture devices due to slower than expected sell through at retailers**, particularly in the first half of the quarter.

> **Fourth quarter revenue includes a $21 million reduction for price protection related charges resulting from the HERO4 Session repricing in December**.

> Non-GAAP gross margin for the fourth quarter of 2015, excluding the impact of price protection and **a charge of between $30 million and $35 million to cost of revenue for excess purchase order commitments, excess inventory, and obsolete tooling is anticipated to be between 44.5% and 45.5%**.

> \*     \*     \*

> **GoPro has implemented a reduction in its workforce of approximately 7 percent**.

83.     Investor reaction was swift and negative.  As *CNBC* reported in an article published on January 13, 2016: "**GoPro shares plunged as much as 28 percent in after-hours trading after a halt**.  Shares of Ambarella, a key GoPro producer, also fell by about 10 percent in extended trading."

84.     On January 13, 2016, *Investor's Business Daily* published an article entitled "GoPro stock crashes on holiday sales, profit warning."  The article noted, among other things, that after GoPro's profit warning and stock price plunge, analysts characterized the stock as "'**total junk.**'"

85.   On January 14, 2016, Barclays issued a report noting the impact on GoPro's future financial condition from the Hero4 Session price reductions was much greater than previously expected and would result in lower ASPs:

Moving to EW; 2016 Moves from Transition to "Show Me"

**Execution woes continue and a quick recovery seems unlikely**: After the weak 3Q results and 4Q guide, we stuck with our long-term OW view given the opportunities we saw in 2016 . . . . **Price reductions for the Hero Session, which may have picked up after the cut in 4Q15, could mean lower blended ASPs and margins longer term.**

\*          \*          \*

**Management had discussed the impact a fuller retail channel heading into the holiday season would have on 4Q15 results on its last earnings call, but the impact appears to be much greater than previously anticipated.**

86.   On January 14, 2016, analysts at Wedbush issued a report entitled "Q4 Revenue and Margins Come in Well Below Expectations from Weak Sell-Through as HERO4 Session Strikes Again; Maintain OUTPERFORM, Lower PT to $18," which stated that the "HERO4 Session has been a problem since its launch" hurting quarterly sales and margins:

**The HERO4 Session has been a problem since its launch in early July. Its starting price of $399.99 was cut to $299.99 in late September, and roughly one month later, GoPro announced worse-than-expected Q3 results and below consensus Q4 guidance attributed (at least in part) to weak HERO4 Session sell-through. In early December, the price was cut further to $199, but the second price cut apparently didn't stimulate sufficient to allow GoPro to approach Q4 top-line guidance.** It also appears to have hurt gross margins, although we did note some discounting of other HERO4 capture devices in Q4 as retailers tried to improve sell-through.

87.   As a result of the January 13, 2016 pre-announcement, GoPro's stock price fell 14.6%, from $14.61 at close on January 13, 2016, to $12.48 at close on January 14, 2016, on massive volume of more than 31 million shares traded.

88.   On February 3, 2016, after the market closed, GoPro issued a press release to announce its 4Q15 and FY15 financial results.   The press release confirmed GoPro's poor performance, which reflected slow sales of the Hero4 Session and additional charges to earnings to reflect the Hero4 Session's December 4, 2015 price reductions including "purchase order commitments":

GoPro expects revenue to be approximately $435 million for the fourth quarter of 2015 and $1.6 billion for the calendar year. *Fourth quarter revenue reflects lower than anticipated sales of its capture devices due to slower than expected sell through at retailers, particularly in the first half of the quarter.*

*Fourth quarter revenue includes a $21 million reduction for price protection related charges resulting from the HERO4 Session repricing in December.* Non-GAAP gross margin for the fourth quarter of 2015, excluding the impact of price protection and a charge of between $30 million and $35 million to cost of revenue for excess purchase order commitments, excess inventory, and obsolete tooling is anticipated to be between 44.5% and 45.5%.

\*     \*     \*

*Full year revenue also reflected charges of approximately $40 million for price protection related charges issued in connection with reductions of the HERO4 Session selling price in September and December.*

89.     The press release also announced for the first time that Defendant Lazar would resign from GoPro, effective March 11, 2016, and would be replaced by Brian McGee, who had served as GoPro's Vice President of Finance since September 2015. *CNN Money* would later report: "After posting a huge loss last quarter, [GoPro] *fired its chief financial officer.*"

90.     On the same day, GoPro held a conference call to discuss additional details concerning 4Q15's disappointing financial results. During the call, Defendant Lazar reported poor gross margins, operating losses, and EPS losses. Defendants attributed the poor results to slow sales price protection:

[Lazar:] *Gross margin for 2015 was 41.7%, compared to 45.1% in 2014. Gross margin for the quarter was 29.6%, compared with 48% in the fourth quarter of 2014, and lower than the preliminary gross margin of 34.5% to 35.5% that we provided back in January 13.*

\*     \*     \*

*We recorded an operating loss in the fourth quarter of $21.6 million, and an adjusted EBITDA loss of $9.3 million, reflecting a lower-than-anticipated revenue, and the product realignment and price-protection-related charges previously mentioned.*

*Loss per share for the fourth quarter was $0.08, down from earnings per diluted share of $0.99 in the prior-year comparable quarter. GAAP loss for the fourth quarter was $34.5 million, or a loss of $0.25 per share. This compares with GAAP net income of $122.3 million, or $0.83 per diluted share for Q4 2014.*

91.     During the February 3, 2016 conference call, Defendant Lazar also disclosed that consumers finally increased their demand for the Hero4 Session due to the price reduction to $199,

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS **3:16-cv-00232-JST**                                                                                  - 28 -

1   50% of its original sales price: "*Since our December price reduction of the HERO4 Session, we*

2   *have seen a strong up-tick in demand for this product.*"  Defendant Lazar concurred, disclosing that

3   "*we're starting to see those sell-through trends.*"

4          92.      Defendant Lazar also disclosed that Hero4 Session ASPs were down for 4Q15 and

5   implied that Defendants had experienced noticeable pricing pressure on the Hero4 Session: "ASPs

6   on all our HERO and HERO4 products, with the exception of the HERO4 Session, were up

7   sequentially, as we did not experience any noticeable pricing pressure for these products during the

8   quarter."

9          93.      Defendant Lazar further disclosed that channel inventory was so significant that he

10   did not expect it to be pretty well cleaned up until the end of 1Q16 based on current demand.  Given

11   Defendants comments concerning the positive performance of Hero4 Silver and Hero4 Black, it is

12   apparent that the channel inventory to which Lazar referred, comprised the Hero4 Session.

13          94.      During the February 3, 2016 call, Defendant Woodman acknowledged that the Hero4

14   Session, launched as a premium offering at $399, was now the Company's entry-level camera and

15   acknowledged that the Company's challenges with Hero4 Session were entirely about price:

16          [Woodman:]  Fourth-quarter and full-year results were *impacted by a charge*

17   *of approximately $57 million, resulting from our decision to end-of-life the entry-level HERO, HERO Plus, and HERO Plus LCD products*, which we will stop

18   selling in April. . . .  In Q4, *we reduced the price of HERO4 session to $199, positioning it as the best entry-level product we have ever made.*

19                               *     *     *

20          [Analyst:]  *Do you look at it* [Hero4 Session] *as a product that just was mis-priced*

21   *from the outset, or is it more than that*? . . . *I'm just wondering where -- what the mistake was along that way*?

22                               *     *     *

23          [Woodman:]  *To summarize, it was entirely about price.*

24          95.      Investors reacted rapidly to this new disclosure.  In an article published on February

25   3, 2016, the *Los Angeles Times* reported:

26          GoPro stock closed at $10.71, up 4.6%, but *slipped as much as 19% in after-hours trading.  The steep drop resulted in the company halting trading of its stock*

27   *for roughly 25 minutes*. . . .

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS **3:16-cv-00232-JST**                                          - 29

GoPro Chief Executive Nick **Woodman said in a statement that GoPro's numbers were hurt by disappointing sales of its latest wearable camera, the Hero 4 Session, which launched in July.  The cube-shaped camera didn't sell well and underwent two price cuts, reducing its retail price from $400 to $199**.

96.     Analysts were highly critical of GoPro's press release and commentary.  For example, on February 3, 2016, analysts at Piper Jaffray issued a report entitled "Q1 Guidance Well Below Expectations; CFO Transition; Reiterate [Underweight] Rating," which expressed disappointment with the newly disclosed gross margin and EPS results for 4Q15: "While sales and gross margins were pre-announced, gross margin still missed at 29.6% ([versus] mid-point of preannouncement at 35%) and [GoPro] reported a [loss per share] of ($0.08) on sales of $436M."  The report added that Hero4 Session had been mispriced: "On the call **management admitted to mispricing the Session product** but stressed that they were not seeing increased competition nor losing share."

97.     On February 3, 2016, Chief Research Analyst Jan Dawson of JackDaw Research stated: "I was a bit surprised by the tone on the call, which displayed a complete lack of contrition and regret even in the face of terrible earnings and worse guidance."

98.     On February 4, 2016, analysts at J.P. Morgan issued a report entitled "4Q15 Results: Not for the Faint of Heart," stating that GoPro revenue and earnings guidance fell "well short of consensus expectations in what looks like a 'kitchen sink' outlook for the beginning of a pivotal investment year."[11]  The analysts were skeptical of GoPro's prospects for 2016:  "GPRO previously paid lip-service to delivering both growth and profitability, but 2016 will probably yield little of either."

99.     On February 4, 2016, analysts at Hillard Lyons issued a report entitled "Sophomore Slump Continues; Weak 1H'16 Outlook; Lowering Price Target to $13 from $24[,]" which blamed "slower sales of GoPro's capture devices and a price guarantee on the new HERO Session reduced revenue an additional $40 million" for the Company's poor results.  The report continued: "Lower margins from an excess inventory and retooling charge of $57 million also negatively impacted performance."

---

[11]   A "kitchen sink" outlook is when a company announces all of its bad financial news at one time.

1   100.   On February 4, 2016, analysts at Morgan Stanley issued a report entitled "Expecting

2   Cash Burn in a Tough Spot, Reduce PT to $9," in which they stated:

3          After **preannouncing Q4 revenues below their original guidance**, management's
           commentary on Wednesday evening pointed to continued channel reduction activity

4          in Q1.  We had previously expected retailers to continue working down inventory
           ahead of new product launches later this year, but management also announced their

5          intent to discontinue much of their entry-level HERO cameras.  We view the
           announcement as representing additional inventory reduction against our original

6          shipment estimates.  After seeing significant channel fill from entry level products
           throughout 2015, the decision to discontinue them likely suggests that inventory

7          levels exiting December were even higher than we previously thought (we originally
           estimated 4 weeks of inventory).

8
    101.   In the wake of GoPro's February 3, 2016 press release and earnings call, its stock

9

10  price fell an additional 8.7%, from $10.71 at close on February 3, 2016, to $9.78 at close on

11  February 4, 2016, on volume more than two times the Class Period average.

12        **LOSS CAUSATION AND ECONOMIC LOSS FOR EXCHANGE ACT CLAIMS**

13        102.   Plaintiff incorporates ¶¶1-101 above and alleges that during the Class Period

14  Defendants materially misrepresented GoPro's true financial condition by making false statements

15  and omissions largely concerning or relating to the Hero4 Session, including statements concerning

16  its strong sales, stable price point, absence of pricing pressure and refusal to discount, the health of

17  inventory in the distribution and sales channel, the Company's purchases of chips from its sole chip

18  supplier, and the Company's future financial prospects.

19        103.   In truth, Defendants knew or deliberately disregarded, and failed to disclose, that

20  GoPro had reduced its internal Hero4 Session sales forecast and was purchasing fewer supplies from

21  the camera's major supplier, that they had done no marketing in advance of or in coordination with

22  the Hero4 Session launch, that the initial sale price of the Hero4 Session was too high, that retailers

23  were experiencing channel build up as the Hero4 Session failed to sell-through to consumers, and

24  that, as a result, the Company lacked a basis for its publicly-issued financial guidance.

25        104.   Defendants' false and misleading statements had their intended effect and caused

26  GoPro stock to trade at artificially inflated prices throughout the Class Period and to reach a Class

27  Period high of $64.74 per share on August 10, 2015.

28

105.     On October 28, 2015, the true state of the Company's operations began to be revealed when Defendants announced 3Q15 financial results, which, among other negative news, included a $37.5 million miss to midpoint of the Company's previously issued guidance.  ¶65.  Defendants also provided 4Q15 guidance that was significantly below analysts' expectations.  ¶69.

106.     In explaining the disappointing results and outlook, Defendants also provided, in addition to the revenue and earnings miss, new information that was directly related to, and inconsistent with, their prior representations.  Indeed, Defendants revealed that initial sell-through of the Hero4 Session was weak, that they had observed unfavorable sales-through trends for the Hero4 Session in July 2015, that channel inventory of the Hero4 Session was above target levels, that they had underfunded the marketing necessary to drive a successful Hero4 Session launch, and that, as a result, revenue was reduced by $19 million in price protection and MDF.  *See*, *e.g.*, ¶¶66-68.  As a result, GoPro's stock price declined 15.2%, from a close of $30.21 on October 28, 2015, to a close of $25.62 on October 29, 2015, on substantially increased volume.  ¶72.

107.     However, Defendants mitigated the decline by falsely reassuring investors that the Hero4 Session was now selling in line with expectations, that GoPro had not experienced pricing pressure during the quarter, and that ASPs remained flat.  ¶¶69-70.  The Company's stock price continued to trade at artificially inflated levels.

108.     Investment analysts attributed the October 29, 2015 stock price decline to GoPro's worse-than-expected 3Q15 financial results, which they attributed to the failure of Hero4 Session to perform as expected.  ¶71.  Nevertheless, based upon Defendants' sales assurances, investment analysts believed that the Company's stock price had fully incorporated the bad news.  *Id.*

109.     On December 4, 2015, the true state of the Company's operations and financial condition was further, though still only partially, revealed, when Defendants disclosed that, notwithstanding their statement that the Hero4 Session was at the right price after the September 2015 price cut, GoPro was slashing the price of the Hero4 Session for the second time.  ¶75.  This time, the price was reduced from $299 to $199, a 33% reduction from the previous price cut and a 50% reduction from the initial price of $399.  *Id.*  This disclosure caused GoPro's stock price to decline as more of the artificial inflation came out of the stock price and investors absorbed the

1  significance of the new information and its relationship to Defendants' earlier misrepresentations.

2  ¶76.

3        110.    The December 4, 2015 disclosure was directly related to, and sharply inconsistent

4  with, Defendants' prior misrepresentations.  Indeed, while Defendants stated that the first Hero4

5  Session price reduction had led to its sales meeting expectations and denied the existence of pricing

6  pressure or falling ASPs, the second price reduction contradicted those representations.  ¶70.  As a

7  result, GoPro's stock price fell an additional 5%, from a close of $18.93 on December 3, 2015, to a

8  close of $18.00 on December 4, 2015, on trading volume more than the Class Period average.  ¶76.

9  However, the Company's stock price continued to trade at artificially inflated levels.

10        111.    On December 5, 2015, Defendant Woodman appeared on QVC to hawk the Hero4

11  Session at its new, lower price, throwing in accessories for free to create further incentive for

12  consumers to buy.  ¶77.  On December 9, 2015, Defendant Woodman admitted that GoPro had

13  mispriced and not sufficiently marketed the Hero4 Session.  ¶79.  On December 10, 2015, GoPro's

14  VP of Communications admitted that the Company had done zero marketing of the Hero4 Session at

15  launch.  ¶80.  These disclosures continued to drive the Company's stock price down, further

16  removing artificial inflation from the stock price.  ¶81.

17        112.    In a December 14, 2015 article, *CNN Money* questioned whether GoPro was "just a

18  passing fad – the high tech equivalent of a Pet Rock or Cabbage Patch kid" and commented that

19  Defendant Woodman's appearance on QVC "may seem like an act of desperation." *Id*.  The article

20  also noted recent downgrades from analysts at Citi and Morgan Stanley. *Id*.

21        113.    On January 13, 2016, the true state of the Company's operations and financial outlook

22  was more fully revealed when Defendants preliminarily announced GoPro's 4Q15 and FY15

23  earnings, which, among other things, missed the midpoint of the Company's previously issued

24  guidance by $90 million.  ¶82.  Defendants announced that their revenue had been affected by $2.1

25  million in price protection related charges from the Hero4 Session price reductions and a charge of

26  between $30 million and $35 million for excess purchase order commitments, excess inventory, and

27  obsolete tooling. *Id*.  Defendants also announced that GoPro was laying off 7% of its workforce. *Id*.

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS **3:16-cv-00232-JST**          - 33 -

1    114.    The January 13, 2016 disclosures consisted of new information that was directly

2  related to, and inconsistent with, Defendants' prior representations.  As a result, GoPro's stock price

3  declined 14.6% from a close of $14.61 on January 13, 2016, to a close of $12.48 on January 14,

4  2016, on volume of more than three times the Class Period average.  ¶87.  The investor reaction was

5  so swift and negative that Defendants temporarily halted aftermarket trading of its stock in the wake

6  of the January 13, 2016 disclosures.  ¶83.  However, the Company's stock price continued to trade at

7  artificially inflated levels.

8    115.    Investment analysts attributed the stock price decline on January 14, 2016, to the new

9  information, and they continued to blame Hero4 Session's poor performance for the negative results.

10  Specifically, analysts ascribed the miss to Hero4 Session's poor sell-through rates and high price, as

11  well as charges due to excess purchase order commitments and excess inventory.  ¶¶83-86.  For

12  example, analysts at Wedbush stated: "The HERO4 Session has been a problem since its launch in

13  early July" and commented that the second price cut in December "apparently didn't stimulate

14  sufficient [demand] to allow GoPro to approach Q4 top-line guidance."  ¶86.

15    116.    On February 3, 2016, Defendants announced GoPro's 4Q15 and FY15 financial

16  results, which were largely in line with the January 13, 2016 preannouncement.  During a conference

17  call the same day, Defendants disclosed new information that was directly related to, and

18  inconsistent with, their prior representations.  Among other new disclosures, Defendants revealed

19  that they would discontinue many of their entry-level cameras in order to reposition Hero4 Session

20  in their place.  ¶94.  Defendants' disclosures caused GoPro's stock price to decline as more of the

21  artificial inflation was removed and investors absorbed the significance of the new information and

22  its relationship to the alleged misrepresentations.

23    117.    Following the February 3, 2016 disclosures, GoPro's stock price declined 8.7% from

24  a close of $10.71 on February 3, 2016, to a close of $9.78 on February 4, 2016, on substantially

25  increased trading volume of more than two times the Class Period average.  ¶101.  Once again,

26  investor reaction was so swift and negative that Defendants temporarily halted trading of its stock in

27  the wake of the February 3, 2016 disclosures.  ¶95.

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS **3:16-cv-00232-JST**                                                                              - 34 -

1       118.    Investment analysts and media continued to attribute the disappointing results to the

2   Hero4 Session.  For example, on February 3, 2016, the *Los Angeles Times* published an article in

3   which it reported that Woodman admitted "that GoPro's numbers were hurt by disappointing sales of

4   its latest wearable camera, the Hero4 Session." ¶95.  On February 3, 2016, analysts at Piper Jaffray

5   cited "management['s] admi[ssion] to mispricing the Session product." ¶96.  On February 4, 2016,

6   analysts at Morgan Stanley stated: "[M]anagement also announced their intent to discontinue much

7   of their entry-level HERO cameras. . . . [T]he decision to discontinue them likely suggests that

8   inventory levels exiting December were even higher than we previously thought." ¶100.

9       119.    Like other Class members who purchased GoPro stock at artificially inflated prices

10  during the Class Period, Plaintiff suffered an economic loss, *i.e.*, damages, when GoPro's stock

11  prices declined upon the disclosures correcting the alleged misrepresentations.

12      120.    The timing and magnitude of GoPro's stock price declines negate any inference that

13  the loss suffered by Plaintiff and other Class members was caused by changed market conditions,

14  macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants'

15  fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members

16  was a direct result of Defendants' fraudulent scheme and misrepresentations to artificially inflate

17  GoPro's stock price and the subsequent significant decline in the value of GoPro stock when the true

18  state of GoPro's operations correcting the misrepresentations was revealed to the market.

19
**THE STATUTORY SAFE HARBOR DOES NOT APPLY TO
DEFENDANTS' FALSE AND MISLEADING STATEMENTS**
20

21      121.    The statements alleged herein to have been false and misleading are not subject to the

22  Private Securities Litigation Reform Act's ("PSLRA") statutory safe harbor protection for forward-

23  looking statements because they were either: (i) not forward looking; (ii) subject to exclusion; or

24  (iii) not identified as forward looking or accompanied by meaningful cautionary language.

25      122.    The PSLRA's statutory safe harbor for written statements provides protection for a

26  written forward-looking statement if it is: (i) identified as such; ***and*** (ii) accompanied by ***meaningful***

27  cautionary language.

28

123.    The PSLRA's statutory safe harbor for oral statements provides protection for an oral forward-looking statement if it is: (i) accompanied by a cautionary statement that the *particular* oral statement is a forward-looking statement *and* that the actual results might differ materially from those projected in the forward-looking statement; *and if* (ii) it is accompanied by an oral statement that additional information concerning factors that would cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document (or portion thereof), *and* the accompanying oral statement identifies the document (or portion thereof) that contains the additional information about those factors relating to the forward-looking statement, *and* the information contained in the written document contains *meaningful* cautionary language.

124.    The PSLRA's statutory safe harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the SEC on Forms 8-K.

125.    Statements of historical fact, current condition, or a mixture thereof are not forward looking and are thus not protected by the PSLRA's statutory safe harbor.  Among the statements alleged herein to have been false and misleading, the following are examples of actionable statements of historical or current fact:

- Our core business *is enjoying* terrific momentum;

- Channel inventory levels both in the US and abroad [*currently*] look healthy;

- We *did not experience* any noticeable camera pricing pressure during this quarter;

- [T]he momentum that *we are seeing* with Session out of the gates . . . is testament to the strength of GoPro's brand;

- We really *haven't seen* any ASP erosion;

- [W]e *don't* really discount;

- The overall ASPs for the Company *have actually remained* pretty steady;

- [Sales *are*] *going* well and sales *are improving* as we move towards the holiday season;

- It doesn't necessarily mean *we're done* for the fourth quarter and we don't have new products;

- Session *is now* selling in line with what we would typically expect . . . [and] *is now* performing as a full-fledged member of the HERO4 lineup;

- Q3 ASPs *were* relatively flat and overall we *did not experience* any noticeable pricing pressure during the quarter; and

- ASPs over the last few years . . . *have* either *been* relatively flat or up.

126.   Defendants also made certain false written or oral statements during the Class Period that were forward-looking, including the financial guidance issued by Defendants on July 21, 2015 and October 28, 2015.  ¶¶48, 69.  To the extent that such forward-looking statements were presented and calculated in accordance with GAAP, they are not protected by the statutory safe harbor.

127.   To be meaningful, cautionary language must identify important factors that could cause actual results to differ materially from those in the forward-looking statement.  Cautionary statements can only be meaningful if they discredit the alleged misrepresentations so obviously that the risk of real deception dropped to nil.  In other words, cautionary language must be extensive and directly related to the alleged misrepresentation and must disclose the specific risks and their magnitude.  Defendants' purported cautionary language does not meet this standard.

128.   The cautionary language that accompanied the oral forward-looking statements made during the July 21, 2015 conference call, was inadequate to trigger protection of any forward-looking statements made therein, including GoPro's 3Q15 financial forecast.  Defendants failed to sufficiently identify the forward-looking statements and failed to identify a readily available written document (or portion thereof) that contained the purportedly meaningful cautionary language, which would provide information concerning facts that would cause results to be materially different.  Defendants' vague reference during the July 21, 2015 conference call, to boilerplate risks set forth in GoPro's annual report on Form 10-K for the fiscal year ended December 31, 2014, as well as "other reports that we may file from time to time with the SEC," was inadequate to satisfy the safe harbor's requirements:

> [Brown:]  I would like remind you that statements on this call including, but not limited to, those about our projected future and financial results including revenue and expenses, economic and marketing trends, our future plans, prospects, and growth opportunities, the continued adoption of our products, the anticipated benefits of our long-term strategy, our customers' competitive position, market share and leadership position in various markets constitute forward-looking statements.  These forward-looking statements and all other statements that may be made on this call are

not historical facts, are subject to a number of risks and uncertainties that may cause actual results to differ materially.  These forward-looking statements speak only to today's call, and we do not undertake any obligation to undertake these forward-looking statements.  We refer you to our annual report form 10-K for the year ended December 31, 2014, which is on file with the Securities and Exchange Commission.  In particular to the section entitled risk factors, and to other reports that we may file from time to time with the SEC for additional information on factors that can cause actual results to differ materially from our current expectations.

129.    The cautionary language that accompanied the oral forward-looking statements made during the October 28, 2015 conference call, was inadequate to trigger protection of any forward-looking statements made therein, including the Company's 4Q15 and FY15 financial forecast. Defendants failed to sufficiently identify the forward-looking statements and failed to identify a readily available written document (or portion thereof) that contained the purportedly meaningful cautionary language, which would provide information concerning facts that would cause results to be materially different.  Defendants' vague reference during the October 28, 2015 conference call, to the Company's annual report on Form 10-K for the fiscal year ended December 31, 2014, as well as "other reports that we may file from time to time with the SEC," was inadequate to satisfy the safe harbor's requirements:

[Sirkowski:]  I would like to remind you that statements on this call including but not limited to those about our projected future and financial results, including revenue and expenses, economic and market trends, our future plans, prospects and growth opportunities, the continued adoption of our products, the anticipated benefits of our long-term strategy, our customers, competitive position, market share and leadership position in various markets constitute forward-looking statements.

This forward-looking statements and all other statements that may be made on this call that are not historical facts, are subject to a number of risks and uncertainties that may cause actual results to differ materially.  These forward-looking statements speak only to today's call, and we do not undertake any obligation to update these forward-looking statements.  We refer you to our annual report on Form 10-K for the year ending December 31, 2014, which is on file with the Security and Exchange Commission.  In particular, to the sections entitled risk factors, and to other reports that we may file from time to time with the SEC for additional information on factors that can cause actual results to differ materially from our current expectations.

130.    Even assuming that Defendants sufficiently identified their forward-looking statements and directed investors to the appropriate readily-available written document (or portion thereof) containing meaningful risk factors, which they did not, the cautionary language found within the Company's Form 10-K for the fiscal year ended December 31, 2014 – filed more than

1   four months before the Hero4 Session launch, more than five months before the July 21, 2015

2   conference call and more than eight months before the October 28, 2015 conference call – was, as

3   detailed below, inadequate to invoke the safe harbor protection for forward-looking statements

4   concerning guidance made on those calls.  There are three warnings in the Form 10-K that can be

5   read to address risks regarding GoPro's ability to accurately forecast financial results, accompanied

6   by an explanation why they were not sufficient to meaningfully or adequately address Defendants'

7   misrepresentations.

| Cautionary Language | Reasons Not Meaningful or Adequately Tied to Alleged Misrepresentation |
|---|---|
| *If our sales during the holiday season fall below our forecasts, our overall financial condition and results of operations could be adversely affected*. | July 21, 2015 False and Misleading Guidance:<br><br>The failure to achieve the 3Q15 financial guidance issued on July 21, 2015, did not result from the holiday sales falling below forecast, as holiday sales occur after the end of 3Q15.<br><br>October 28, 2015 False and Misleading Guidance:<br><br>Defendants did not ascribe the failure to meet the 4Q15 and FY15 financial guidance issued on October, 28, 2015, to below-forecast holiday sales.  Rather, in the January 13, 2016 pre-announcement of 4Q15 and FY15 financial forecast, the Company attributed the failure to achieve guidance to "slower than expected sell through at retailers, particularly in the first half of the quarter," *i.e.*, before the holiday season. ¶82.  Neither the January 13, 2016 press release nor the February 3, 2016 conference call provide any indication that the failure to achieve guidance arose from the failure to achieve the Company's holiday forecast.  ¶¶82, 88-94. |

| Cautionary Language | Reasons Not Meaningful or Adequately Tied to Alleged Misrepresentation |
|---|---|
| *We may have difficulty in accurately predicting our future customer demand which could adversely affect our operating results*. | July 21, 2015 False and Misleading Guidance: <br><br> While Defendants stated that lower than expected customer demand was responsible for the Company's failure to achieve the 3Q15 financial guidance issued on July 21, 2015, they ascribed the lower than expected demand to their own decision to "underfund[] marketing in the second and third quarters of this year." ¶66. Thus, the difficulty was not in predicting future customer demand, a factor external to the Company, but in supporting and creating customer demand. <br><br> October 28, 2015 False and Misleading Guidance: <br><br> On February 3, 2015, Defendant Woodman stated that the problem with Hero4 Session sales was "entirely about price." ¶94. Thus, the 4Q15 and FY15 guidance issued on October 28, 2015 was not false and misleading due to the difficulty in accurately predicting customer demand. |
| *[O]ur ability to accurately forecast demand for our products could be affected by . . . channel inventory levels[.]* | July 21, 2015 False and Misleading Guidance: <br><br> Defendants were aware of the build in channel inventory since before July 21, 2015. ¶¶54(c), (g), 66. Thus, this cautionary language was misleading in light of historical fact. <br><br> October 28, 2015 False and Misleading Guidance: <br><br> Defendants were aware of the build in channel inventory since before October 28, 2015. ¶¶54(c), (g), 60(a), 66. Thus, this cautionary language was misleading in light of historical fact. |

131.    Defendants are liable for the false forward-looking statements because, at the time each such statement was made, the particular speaker knew that the specific forward-looking statement was false or misleading, or the forward-looking statement was authorized or approved by an executive officer of GoPro who knew that the statement was false or misleading when made.

## CLASS ACTION ALLEGATIONS

132.    Plaintiff brings this action as a class action on behalf of all those who purchased or otherwise acquired GoPro publicly traded securities during the Class Period (the "Class"). Excluded

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS **3:16-cv-00232-JST**                                                                                        - 40 -

1    from the Class are Defendants, the officers and directors and affiliates of Defendants, members of

2    their immediate families and their legal representatives, heirs, successors or assigns, and any entity

3    in which Defendants have or had a controlling interest.

4          133.    The Class members are so numerous and geographically dispersed that joinder of all

5    members is impracticable.  GoPro securities actively traded publically on NASDAQ.  Record owners

6    and other members of the Class may be identified from records maintained by GoPro or its transfer

7    agent and may be notified of the pendency of this action by mail, using the form of notice similar to

8    that customarily used in securities class actions.  While the exact number of Class members is

9    unknown to Plaintiff, GoPro reported 116 shareholders of record as of January 31, 2016[12] and more

10   that 132 million shares of stock were outstanding during the Class Period.  Accordingly, Plaintiff

11   reasonably believes that there are thousands of members in the proposed Class.

12         134.    Plaintiff's claims are typical of the claims of the members of the Class as all members

13   of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is

14   complained of herein.

**APPLICABILITY OF THE PRESUMPTION OF RELIANCE**
**(FRAUD ON THE MARKET)**

15   
16         135.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-

17   market doctrine in that, among other things:

18         (a)    Defendants made public misrepresentations or failed to disclose material facts

19   during the Class Period;

20         (b)    The omissions and misrepresentations were material;

21   
22         (c)    GoPro's securities traded in an efficient market;

23         (d)    The misrepresentations alleged would tend to induce a reasonable investor to

24   misjudge the value of GoPro's securities; and

25   
26   

---

27   [12]  This figure does not include the numerous GoPro investors whose GPRO stock is held in
28   brokerage or similar accounts.

(e)     Plaintiff and other members of the Class purchased or otherwise acquired GoPro securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

136.     At all relevant times, the market for GoPro's securities was efficient for the following reasons, among others:

(a)     As a regulated issuer, GoPro filed periodic public reports with the SEC; and

(b)     GoPro regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

137.     Plaintiff incorporates ¶¶1-136 by reference.

138.     Defendants are liable for making false statements and failing to disclose adverse facts known to them about GoPro.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on those who purchased or otherwise acquired GoPro securities during the Class Period was a success, as it: (i) deceived the investing public regarding GoPro's business and financial condition; (ii) artificially inflated the price of GoPro securities; and (iii) caused Plaintiff and other Class members to transact in GoPro securities at inflated prices.

139.     During the Class Period, Defendants participated in the preparation of and/or caused to be disseminated the false or misleading statements specified above, which they knew or recklessly disregarded were materially false or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

140.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

1    (b)    Made untrue statements of material facts or omitted to state material facts

2  necessary in order to make statements made, in light of the circumstances under which they were

3  made, not misleading; or

4    (c)    Engaged in acts, practices, and a course of business that operated as a fraud or

5  deceit upon Plaintiff and others similarly situated in connection with their transactions in GoPro

6  securities during the Class Period.

7    141.    Defendants, individually and together, directly and indirectly, by the use, means, or

8  instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous

9  course of conduct to conceal the truth and/or adverse material information about GoPro's business,

10  operations, and financial condition as specified herein.

11    142.    The Defendants employed devices, schemes, and artifices to defraud, while in

12  possession of material, adverse, nonpublic information and engaged in acts, practices, and a course

13  of conduct as alleged herein by, among other things, participating in the making of untrue statements

14  of material fact and omitting to state material facts necessary in order to make the statements made

15  about GoPro and its business operations and financial status, in the light of the circumstances under

16  which they were made, not misleading, as set forth more particularly herein, and engaged in

17  transactions, practices, and a course of business which operated as a fraud and deceit upon those who

18  transacted in GoPro securities during the Class Period.

19    143.    The Defendants had actual knowledge of the misrepresentations and omissions of

20  material fact set forth herein, or recklessly disregarded the true facts that were available to them.

21  Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for

22  the purpose and effect of concealing GoPro's true operating condition and financial status from the

23  investing public and supporting the artificially inflated price of its securities.

24    144.    As a result of the dissemination of the materially false or misleading information and

25  failure to disclose material facts, as set forth above, the market price of GoPro securities was

26  artificially inflated during the Class Period.  In ignorance of the fact that the market prices of

27  GoPro's securities were artificially inflated, and relying directly or indirectly on the false and

28  misleading statements, or upon the integrity of the market in which GoPro's securities traded, and/or

1   on the absence of material adverse information that was known to, or recklessly disregarded by,

2   Defendants, but not disclosed in Defendants' public statements during the Class Period, Plaintiff and

3   the other Class members acquired GoPro securities during the Class Period at artificially inflated

4   prices and were ultimately damaged thereby.

5          145.    At the time of said misrepresentations and omissions, Plaintiff and other Class

6   members were ignorant of their falsity, and believed them to be true.  Had Plaintiff and other Class

7   members and the marketplace known the truth regarding the problems that GoPro was experiencing,

8   which Defendants did not disclose, Plaintiff and other Class members would not have transacted in

9   GoPro securities, or, if they had transacted in its securities during the Class Period, would not have

10   done so at the artificially inflated prices which they paid.

11          146.    By reason of the foregoing, Defendants have violated §10(b) of the Exchange Act and

12   Rule 10b-5 promulgated thereunder.

13          147.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and

14   the other Class members suffered damages in connection with their Class Period transactions in

15   GoPro securities.

16                        **COUNT II**

17         **For Violation of §20(a) of the Exchange Act**
             **Against the Individual Defendants**
18

19        148.    Plaintiff incorporates ¶¶1-147 by reference.

20        149.    The Individual Defendants acted as controlling persons of GoPro within the meaning

   of §20(a) of the Exchange Act:
21

22            (a)    By reason of their positions as executive officers and/or directors, their

23   participation in and awareness of GoPro's operations and intimate knowledge of the false statements

24   and omissions made by GoPro and disseminated to the investing public, the Individual Defendants

25   had the power to influence and control, and did influence and control, directly or indirectly, the

26   decision-making of the Company, including the content and dissemination of the various statements

   which Plaintiff contends were false and misleading;
27

28

1    (b)    The Individual Defendants participated in conference calls with investors and

2    were provided with, or had unlimited access to, copies of the Company's reports, press releases,

3    public filings, and other statements alleged by Plaintiff to be misleading before or shortly after these

4    statements were issued, and had the ability to prevent the issuance of the statements or cause the

5    statements to be corrected; and

6    (c)    Because of their positions as CEO, CFO, and President and Director, and

7    further because they assumed the role of Chief Operating Officer since February 2015, the Individual

8    Defendants directly participated in the Company's management and were directly involved in

9    GoPro's day-to-day operations.  The Individual Defendants also controlled the contents of GoPro's

10   quarterly reports and other public filings, press releases, conference calls, and presentations to

11   securities analysts and the investing public.  The Individual Defendants prepared, reviewed and/or

12   were provided with copies of GoPro's reports, press releases, and presentation materials alleged to

13   be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent

14   their issuance or cause them to be corrected and failed to do so.

15   150.    By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of

16   the Exchange Act.

### PRAYER FOR RELIEF

18   WHEREFORE, Plaintiff, demands judgment against Defendants as follows:

19   A.    Declaring that Defendants are liable pursuant to the Exchange Act;

20   B.    Determining and certifying that this action is a proper class action and certifying

21   Plaintiff as a class representative and Plaintiff's counsel as class counsel pursuant to Rule 23 of the

22   Federal Rules of Civil Procedure;

23   C.    Awarding compensatory damages in favor of Plaintiff and the Class against

24   Defendants, jointly and severally, for damages sustained as a result of Defendants' wrongdoing, in

25   an amount to be proven at trial;

26   D.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as

27   reasonable attorneys' fees, costs, and expenses incurred in this action; and

28   E.    Awarding such other relief as the Court may deem just and proper.

1                                        **JURY DEMAND**

2            Plaintiff demands a trial by jury.

3    DATED:  July 28, 2016                    ROBBINS GELLER RUDMAN
                                                & DOWD LLP
4                                            SHAWN A. WILLIAMS
                                             MATTHEW S. MELAMED
5                                            SUNNY S. SARKIS
                                             NADIM G. HEGAZI
6

7                                                    s/ Matthew S. Melamed
8                                              MATTHEW S. MELAMED

9                                            Post Montgomery Center
                                             One Montgomery Street, Suite 1800
10                                           San Francisco, CA  94104
                                             Telephone:  415/288-4545
11                                           415/288-4534 (fax)

12                                           Lead Counsel for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS **3:16-cv-00232-JST**                                                    - 46 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 28, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 28, 2016.

s/ Matthew S. Melamed
MATTHEW S. MELAMED
ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: mmelamed@rgrdlaw.com

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS **3:16-cv-00232-JST**

Case 3:16-cv-00232-JST   Document 90   Filed 07/28/16   Page 50 of 51

# Mailing Information for a Case 3:16-cv-00232-JST Bodri v. GoPro, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Patrice L. Bishop**
  service@ssbla.com

- **Stephen Douglas Bunch**
  dbunch@cohenmilstein.com,efilings@cohenmilstein.com

- **Jeffrey Philip Campisi**
  jcampisi@kaplanfox.com

- **Mario Man-Lung Choi**
  mchoi@kaplanfox.com

- **Catherine Duden Kevane**
  ckevane@fenwick.com,kayoung@fenwick.com,pnichols@fenwick.com,dsheppard@fenwick.com

- **Michael I. Fistel , Jr**
  michaelf@johnsonandweaver.com

- **Lionel Z. Glancy**
  info@glancylaw.com,lglancy@glancylaw.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **Nadim Gamal Hegazi**
  nhegazi@rgrdlaw.com,smorris@rgrdlaw.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com,michaelf@johnsonandweaver.com,ceciliar@johnsonandweaver.com

- **Robert N. Kaplan**
  rkaplan@kaplanfox.com

- **Kaitlin O Keller**
  kkeller@fenwick.com,fkelley@fenwick.com,jtosches@fenwick.com

- **Phillip C Kim**
  pkim@rosenlegal.com

- **Laurence D. King**
  lking@kaplanfox.com,spowley@kaplanfox.com,nlee@kaplanfox.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com

- **Adam Christopher McCall**
  amccall@zlk.com

- **Thomas J. McKenna**
  tjmlaw2001@yahoo.com,tjmckenna@gme-law.com

- **Matthew Seth Melamed**
  mmelamed@rgrdlaw.com,e_file_SF@rgrdlaw.com,e_file_SD@rgrdlaw.com

- **Susan Samuels Muck**
  smuck@fenwick.com,kayoung@fenwick.com,pnichols@fenwick.com,recordsecf@fenwick.com,acaloza@fenwick.com

- **Danielle Suzanne Myers**

dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Lesley F. Portnoy**
  LPortnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Barbara Ann Rohr**
  brohr@faruqilaw.com,smarton@faruqilaw.com,bheikali@faruqilaw.com,ecf@faruqilaw.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net

- **Sunny September Sarkis**
  Ssarkis@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,smorris@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)