UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH BODRI, et al.,

        Plaintiffs,

   v.

GOPRO, INC., et al.,

        Defendants.

Case No. 16-cv-00232-JST

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

Re: ECF No. 94

Lead Plaintiff Camia Investment LLC ("Plaintiff") brings this putative class action complaint alleging violations of the federal securities laws by defendants GoPro, Inc. ("GoPro," or "the Company"), its Chief Executive Officer ("CEO"), Nicholas Woodman, its former Chief Financial Officer ("CFO"), Jack Lazar, and the President and Director of its Board, Anthony Bates (collectively, "Defendants"). Plaintiff alleges in the Amended Consolidated Complaint ("the Complaint") that Defendants made material misrepresentations about the strength of GoPro's HERO4 Session ("Session") camera sales, and that when the truth was revealed about those sales, GoPro's stock fell substantially in value. Defendants move to dismiss the Complaint for failure to state a claim pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as the Private Securities Litigation Reform Act of 1995 ("PSLRA"). ECF No. 94. Because the Complaint fails adequately to plead either a false or misleading statement or scienter the Court will grant the motion to dismiss with leave to amend.

## I.    BACKGROUND

### A.    Allegations of the Complaint

GoPro, founded in 2004, is a consumer electronics company that "develops mountable and wearable cameras, which it calls 'capture devices,' and related accessories designed to enable consumers to capture content while engaged in a wide range of activities." ECF No. 90 ¶ 3. The

Company's "core products are [its] HERO line of capture devices[,]" accounting for "nearly all of the Company's revenue." Id. (internal quotation marks omitted).

On July 12, 2015, GoPro introduced the Hero4 Session camera. Id. ¶ 44. GoPro "touted the Hero4 Session as 'the smallest, lightest, most convenient GoPro possible,' and boasted that "the Hero4 Session's one-button design 'drastically improves the speed and convenience of capturing life moments as they happen.'" Id. The Session was "GoPro's only new camera and key new product offering for FY15." Id. ¶ 4. Plaintiff alleges that by the Session's introduction date, "Defendants [already] knew that the launch would not meet their expectations" because "GoPro had revised downward its internal forecast for Hero4 Session sales . . . before the camera became publicly available due to weak retailer demand." Id. Plaintiff contends that Defendants built and shipped cameras to meet the earlier, higher sales forecast anyway. Id.

Plaintiff alleges the misrepresentations began when "GoPro announced its 2Q15[1] financial results on July 21, 2015." Id. During an investor conference call held that day, Defendants "made false and misleading statements about the contribution that [Session's] sales made to the quarter's results and denied risks associated with the failure of [Session] to sell-through[2] to consumers." Id. Plaintiff takes issue with the following statements made during the conference call: (1) CEO Woodman stated "the momentum that [GoPro] [is] seeing with Session out of the gates . . . is a testament to the strength of GoPro's brand[,]" "we don't have to fortunately wait for a fourth quarter holiday season to launch a product and get a strong positive response from the marketplace," and "it seems that we are capable of launching a product at any time of year. We're happy with what we are seeing." Id. ¶ 50; ECF No. 96-6 at 9; (2) CFO Lazar stated GoPro "did not experience any noticeable pricing pressure during th[e] quarter[,]" Id. ¶ 49; ECF No. 96-6 at 8; and (3) CFO Lazar stated "[c]hannel inventory levels both in the US and abroad look healthy[,]"

___

[1] "2Q15" is shorthand for the second fiscal quarter in 2015.

[2] "[A] company using 'sell-through' accounting recognizes revenue when its distributors sell the product to a reseller (i.e., 'sells through' the distribution channel). Sell-through accounting recognizes revenue later than sell-in accounting does and nets out rebates, discounts, and returns. Thus, the manufacturer does not need to estimate their effect on its revenue." United States v. Goyal, 629 F.3d 912, 914 (9th Cir. 2010).

Id.; ECF No. 96-6 at 8. Analysts reacted positively to Defendants' statements regarding the HERO Session. Id. ¶ 52. J.P. Morgan, for example, noted, "3Q15 guidance beat, driven by management's confidence in the 50% smaller Hero Session and new initiatives . . . ." ECF No. 90 ¶ 52. "Analysts celebrated the key role" Session played "in GoPro's 2Q15 results and 3Q15 expectations." ECF No. 96-6 at 4; ECF No. 90 ¶ 51-52.

Plaintiff argues each of these statements was materially misleading because, at the time they were made, "GoPro had already reduced its internal sales forecast for . . . Session due to weak retail demand for the camera" and "Defendants had already begun cancelling and reducing purchase orders placed with suppliers of . . . Session's parts." ECF No. 96-6 at 4; ECF No. 90 ¶ 54. Plaintiff contends that investors – unaware of what was really going on inside the company – relied on these representations and cause the stock to trade at inflated values. Id. Plaintiff also contends that "the Company's purported risk disclosures, which remained fixed even as the sales risks changed for the worse, described mere possibilities while failing to acknowledge that they had already begun to transpire, [and] were therefore themselves false, misleading, and inadequate." Id.

As Session's sales continued to lag, Plaintiff alleges Defendants continued to mislead investors during a series of investor presentations and media interviews in September 2015. Plaintiff takes issue with the following statements: (1) during one investor conference on September 9, 2015, CFO Lazar stated GoPro does not discount its prices, id. at 5; ECF No. 90 ¶ 55, (2) during another investor conference, CFO Lazar asserted GoPro was "in the right price points," id. at 5; ECF No. 90 ¶ 56; and (3) during an interview with CNBC's "Fast Money Halftime Report" on September 22, 2015, CEO Woodman said Session's sales were "going really well" and "sales [were] improving as we move towards the holiday season." ECF No. 90 ¶ 57. During the September 22 call with CNBC, the interviewer also asked Defendant Woodman about a disclosure by Ambarella, GoPro's sole supplier of chips for its Session camera, on September 1, 2015, that "its wearable camera business segment would be down both sequentially and year-over-year." ECF No. 90 ¶ 58. Woodman rejected the interviewer's understanding that "GoPro must not be ordering as many chips from Ambarella," stating, "That's not accurate." Id.

Plaintiff alleges each of these statements was materially misleading because, on September 28, 2015, GoPro reduced Session's retail price from $399 to $299 in response to Session's "sluggish sales." ECF No. 90 ¶ 9.

On October 28, 2015, after GoPro announced its 3Q15 financial results "missed the Company's previously issued guidance and analyst consensus by wide margins" and provided a "disappointing financial guidance for 4Q15," Defendants acknowledged in an investor conference call that "[t]he financial results reflected weak initial sell-through of the Hero4 Session," that Defendants "were aware of poor initial sell-through of the Hero4 Session in late July 2015," that "Hero4 Session channel inventory exceeded the Company's target levels," and finally that the "Hero4 Session's initial price of $399 was too high." ECF No. 90 ¶ 66. Nevertheless, during the same investor conference call, CEO Woodman stated that, after Session's price reduction, "Session is now selling in line with what we would typically expect for a product at this price point[,]" id. ¶ 11, and CFO Lazar stated "Q3 ASPs were relatively flat and overall we did not experience any noticeable pricing pressure during the quarter[,]" id. Plaintiff argues that these last two statements were materially misleading because the Defendants were aware of Session's continued lagging sales and Defendants would soon have to cut the price once again. Id. ¶ 12.

As a result of the concessions Defendants made to investors on October 28, 2015, "[a]nalysts and investors reacted negatively" and "GoPro's stock price dropped 15.2% on October 29, 2015 to $25.62." Id. ¶ 13. Despite reassuring investors during the same call that the Session "was finally selling in line with expectations, lauding stable ASPs,[3] and representing an absence of pricing pressure," Defendants again reduced the price of the Session from $299 to $199 on December 4, 2015. Id. ¶ 14. On December 5, 2015, Woodman appeared on "the televised home shopping channel QVC, a recognized source of discount products[,]" and "pitched the Hero4 Session at the newly reduced price," throwing in "accessories for free to anyone who bought the reduced-price camera." Id. ¶ 15.

"On January 13, 2016, Defendants preannounced GoPro's 4Q15 and FY15 financial

---

[3] "ASP" refers to average selling price. GoPro's FY15 Form 10-K, filed February 29, 2016, defines ASP as total revenue divided by unit shipments.

results, which missed the midpoint of the guidance issued by Defendants by $90 million. The preannouncement disclosed that revenues were reduced by $21 million for price protection-related charges resulting from the December 2015" price cut and "that the Company had taken a charge of between $30 million and $35 million for excess purchase order commitments and excess inventory. Defendants also announced that they would cut 7% of the Company's workforce." Id. ¶ 17. GoPro then "halted public trading of its stock," and the "price fell 14.6% on January 14, 2016, closing at $12.48 per share." Id. ¶ 18.

"On February 3, 2016, Defendants announced and hosted" another investor call during which they allegedly disclosed that: (i) the Session's "sales did not begin to meet expectations until after its price was reduced for a second time to half its initial price in December 2015; (ii) "[t]he Company would realign its product offering so that the" Session "would be demoted to its entry-level camera;" and (iii) the "Session's failure to sell resulted from the fact that it was mispriced." Id. ¶ 19. GoPro again temporarily halted public trading, and the stock price fell once again to $9.78, "an 85% drop from the artificially inflated Class Period high." Id. ¶ 20.

### B. Procedural History

On January 13, 2016, Plaintiff Joseph Bodri filed a putative class action complaint against GoPro on behalf of purchasers of GoPro securities between July 21, 2015 and January 13, 2016. ECF No. 1. Shortly thereafter, Plaintiffs Barry Lee Deem and Rene Van Meerbeke filed similar proposed class action complaints against GoPro on behalf of purchasers of GoPro securities during the same time period. Deem v. GoPro, Inc., No. 16-cv-00338-JST, ECF No. 1 (N.D. Cal. Jan. 21, 2016); Van Meerbeke v. GoPro, Inc., No. 16-cv-00598-JST, ECF No. 1 (N.D. Cal. Feb. 4, 2016). Each of these complaints raised claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Securities Exchange Act"). Each complaint focused on GoPro's alleged failure to disclose information relating to its HERO line of cameras.

On February 19, 2016, Plaintiff Majesty Palms LLLP filed a putative class action complaint against GoPro on behalf of purchasers of GoPro securities between November 26, 2014 and January 13, 2016. Majesty Palms, LLLP v. GoPro, Inc., No. 16-cv-00845-JST, ECF No. 1 (N.D. Cal. Feb. 19, 2016). As with the previous three actions, Majesty Palms asserted claims

under Sections 10(b) and 20(a) of the Securities Exchange Act. However, unlike the previous three complaints, Majesty Palm's complaint encompassed allegations relating to disclosures of camera-equipped drones, as well as information relating to GoPro's HERO line of cameras.

On April 28, 2016, this Court (1) severed the claims in the <u>Majesty Palms</u> action related to camera-equipped drones and encompassing purchases of GoPro securities between November 26, 2014 and July 20, 2015 from the remaining claims in that action; (2) consolidated the <u>Bodri</u>, <u>Deem</u>, and <u>Van Meerbeke</u> actions with the portion of the <u>Majesty Palms</u> action related to GoPro's HERO line of cameras and encompassing purchases of GoPro securities between July 21, 2015 and January 13, 2016; and (3) denominated the first-filed case, No. 16-cv-00232-JST, as the lead case. <u>See</u> ECF No. 76.

On September 26, 2016, Defendants filed a motion to dismiss the Complaint, which motion the Court now considers. ECF No. 94.

**C.     Jurisdiction**

Because this action arises under the Securities Exchange Act of 1934, the Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II.     DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

Pursuant to Federal Rule of Evidence 201, Defendants ask the Court to take judicial notice of several categories of documents, most of which are SEC filings and transcripts of earnings calls and analyst interviews on which Plaintiff relies in the Complaint. ECF No. 95. Plaintiff opposes Defendants' request in part. ECF No. 99.

**A.     Legal Standard**

In ruling on a 12(b)(6) motion to dismiss, the Court "must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007). "On any motion to dismiss based [on the safe harbor of the PSLRA], the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." <u>In re Quality Systems, Inc. Securities Litigation</u>, 60 F. Supp. 3d 1095, 1107 (C.D. Cal. 2015) (quoting 15 U.S.C. § 78u-5(e)). "If a

plaintiff fails to attach to the complaint the documents on which it is based, defendant may attach to a Rule 12(b)(6) motion the documents referred to in the complaint to show that they do not support plaintiff's claim." In re Silicon Storage Technology, Inc., No. C 05-0295 PJH, 2006 WL 648683, at *2 (N.D. Cal. March 10, 2006) (citing Lee, 250 F.3d at 688-89).

In addition, a Court may take judicial notice of matters in the public record. Federal Rule of Evidence 201(b) provides: a "judicially noticed fact must be one not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

**B.    Defendants' Exhibits**

Plaintiff "objects to Defendants' [request for judicial notice] as to Exhibits C-D, which purport to cite GoPro's February 5, 2015 Form 8-K and April 28, 2015 Form 8-K." ECF No. 99 at 2. Plaintiff also objects to Defendants' request to notice Exhibits R-T, which relate to the Defendants' sale, or lack thereof, of stock during the class period. Id. Since the Court may take notice of matters in the public record, and Exhibits C-D and R-T are such documents and are readily determined by resort to sources whose accuracy cannot reasonably be questioned, the Court may take notice of them. However, the Court takes judicial notice only of the existence of the documents, not of the veracity of allegations or legal conclusions asserted in them. See Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001).

Plaintiff does not object to this Court taking judicial notice of Exhibits A, B, and E-Q, ECF No. 99 at 2, which include GoPro's Form 10 and Form 8 submissions with the Securities and Exchange Commission ("SEC") for the relevant time period, transcripts of four earnings calls, transcripts of CFO Lazar's appearances at two conferences, a Forbes article discussing the Session camera, Morgan Stanley's October 7, 2015 Research Report on GoPro, and a transcript of CEO Woodman's interview with CNBC, ECF No. 95 at 2-3. Since the exhibits are matters of public record, documents on which the complaint necessarily relies, or capable of determination by sources whose accuracy may not reasonably be questioned, the Court grants Defendants' unopposed request for judicial notice of the above documents.

### III.    LEGAL STANDARD

#### A.    The Dual Pleading Requirements

Section 10(b) of the Securities Exchange Act of 1934 prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security.  To establish a violation of Section 10(b), a plaintiff must plead: (1) a material misrepresentation or omission made by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008).

On a motion to dismiss, the Court accepts the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts, as true.  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Moreover, while a plaintiff generally need only plead "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007), "[s]ecurities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')."  Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 604 (9th Cir. 2014).

Under the PSLRA and Rule 9(b), a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged false statement or omission, and a party must "state with particularity the circumstances constituting fraud or mistake."  15 U.S.C. § 78u–4(b)(2)(A); Fed. R. Civ. P. 9(b); see also Oregon Pub. Employees Ret. Fund, 774 F.3d at 605.  "In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity."  In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999), abrogated on other grounds by, S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008).  If the complaint does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the complaint.  15 U.S.C. § 78u-4(b)(3)(A).

8

### B. Falsity and Materiality

The PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B). For statements to be actionable under the PSLRA, they must be both false or misleading *and* material. A statement or omission is misleading under the PSLRA and Section 10(b) of the Exchange Act "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 985 (9th Cir. 2008).

A false or misleading statement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Indus., Inc. v. Northway, Inc., 425 U.S. 438, 449 (1976). "To plead materiality, the complaint's allegations must 'suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable.'" Reese v. Malone, 747 F.3d 557, 568 (9th Cir. 2014) (quoting Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309 (2011)). "'Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim.'" Id. (quoting In re Cutera Sec. Litig., 610 F.3d 1103, 1108 (9th Cir. 2010)).

### C. Scienter

The required state of mind under the PSLRA is a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 n.12 (1976). In order to adequately establish scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

The "strong inference" required by the PSLRA "must be more than merely 'reasonable' or

United States District Court
Northern District of California

1    'permissible'—it must be cogent and compelling, thus strong in light of other explanations."

2    Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007). "A court must compare

3    the malicious and innocent references cognizable from the facts pled in the complaint, and only

4    allow the complaint to survive a motion to dismiss if the malicious inference is at least as

5    compelling as any opposing innocent inference." Zucco Partners, LLC v. Digimarc Corp., 552

6    F.3d 981, 991 (9th Cir. 2009). In evaluating whether a complaint satisfies the "strong inference"

7    requirement, courts must consider the allegations and other relevant material holistically, not

8    "scrutinized in isolation." In re Verifone Holdings, 704 F.3d 694, 701 (9th Cir. 2012).

9        Deliberate or conscious recklessness constitutes intentional conduct sufficient to satisfy the

10   scienter requirement. "An actor is deliberately reckless if he had reasonable grounds to believe

11   material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose

12   such facts although he could have done so without extraordinary effort." Reese, 747 F.3d at 569

13   (quoting In re Oracle Corp. Sec.. Litig., 627 F.3d 376, 390 (9th Cir. 2010) (internal alterations

14   omitted)). "[T]he ultimate question is whether the defendant knew his or her statements were

15   false, or was consciously reckless as to their truth or falsity." Gebhart v. SEC, 595 f.3D 1034,

16   1042 (9th Cir. 2010). "Facts showing mere recklessness or a motive to commit fraud and

17   opportunity to do so provide some reasonable inference of intent, but are not independently

18   sufficient." Reese, 747 F.3d at 569 (quoting In re Silicon, 183 F.3d at 974).

19   **IV.    DISCUSSION**

20       Defendants move to dismiss the Complaint, arguing that it fails to plead particularized

21   facts demonstrating either a material misrepresentation or omission or a strong inference of

22   scienter. ECF No. 94 at 8.

23       **A.    GoPro's Statements Were Not False or Misleading**

24            **1.    Statements Regarding the Strength of Session's Sales**

25       Plaintiff argues Defendants made materially false or misleading statements touting the

26   strength of Session's initial sales. ECF No. 90 at 11-14; see infra 2-3. First, Plaintiff takes issue

27   with a statement made by Founder and CEO Woodman during a press release on July 21, 2015

28   that GoPro's "core business is enjoying terrific momentum as we charge forward into attractive

adjacent markets," and "the momentum we are seeing with Session out of the gates . . . is a testament to the strength of GoPro's brand." ECF No. 90 ¶ 47. Plaintiff argues that these statements were false and misleading because Session's sales were weak at the time this statement was made, as indicated by the fact that (1) GoPro had already reduced the internal Session sales forecast; (2), within days of making this statement, GoPro cancelled orders with its component suppliers for Session; and (3) CFO Lazar and CEO Woodman would later admit as much. ECF No. 90 ¶ 54; ECF No. 98 at 15.

Plaintiff has not adequately pleaded that these statements were false or misleading. For one thing, Plaintiff omits the context in which the statements were made. A statement is misleading only if a reasonable investor, reading the statement fairly and in context, would be misled. See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1332 (2015); In re Leapfrog Enter., Inc. Sec. Litig., 200 F. Supp. 3d 987, 1003–04 (N.D. Cal. 2016) (other statements by defendant "put the allegedly misleading statements . . . in context" and "substantially mitigate[d] the potentially misleading nature of the challenged statements"). In addition to the statements Plaintiffs cite, Lazar said in the same conference call that "[t]he Hero4 Black and Silver, both priced at $399 and above, were our best sellers during the quarter and once again made up over 50% of [GoPro's] total units and revenue," ECF No. 96-6 at 7 and that GoPro was "getting initial feedback on Session," but that the information it had thus far was "a small data set so I really wouldn't infer too much out of this at this point," id. at 9. Placed in this setting, Lazar's comments about Session's reception in the marketplace or the "momentum" of GoPro's "core business" cannot reasonably be described as false or misleading, particularly since Plaintiffs offer no evidence that GoPro's "core business" – which, as Lazar's comments make plain, included much more than the Session camera – was not moving in the right direction.

Moreover, Lazar's statements regarding whether Session had any "momentum" "out of the gates" are corporate puffery, not material misrepresentations. "Puffery is an expression of opinion, while a misrepresentation is a knowingly false statement of fact." Fadia v. FireEye, Inc., Case No. 5:14-cv-05204-EJD, 2016 WL 6679806, at *8 (N.D. Cal. Nov. 14, 2016) (citing Oregon, 774 F.3d at 606). "In the Ninth Circuit, 'vague, generalized assertions of corporate optimism or

statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws' because no reasonable investor would rely on such statements." In re Fusion-io, Inc. Sec. Litig., No. 13-CV-05368-LHK, 2015 WL 661869, at *14 (N.D. Cal. Feb. 12, 2015) (quoting In re Impac Mortg. Holdings, Inc. Sec. Litig., 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008)). A sister court has catalogued instances similar to the one before the Court in which statements like Lazar's have been found to constitute puffery:

> Thus, for example, a court has held not actionable as "mere puffery" statements that "[w]e are very pleased with the learning from our pilot launch," "so far we're getting really great feedback," and "we are very pleased with our progress to date." Wozniak v. Align Tech., Inc., No. C 09–3671 MMC, 2012 WL 368366, at *4–5 (N.D.Cal. Feb. 3, 2012). Likewise, "statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years' " have been held not actionable as mere puffery. In re Cornerstone Propane Partners, L.P. Sec. Litig., 355 F.Supp.2d 1069, 1087 (N.D. Cal. 2005); see also In re Copper Mountain Sec. Litig., 311 F.Supp.2d 857, 868–89 (N.D. Cal. 2004) ("run-of-the-mill" statements such as "business remained 'strong' " are not actionable under § 10(b)); In re LeapFrog Enter., Inc. Sec. Litig., 527 F.Supp.2d 1033, 1050 (N.D. Cal. 2007) (vague statements such as "This is going to be a very big second half for us," "Our underlying sell-through at the retail level remained very strong throughout the third quarter," "consumer demand for our learning products is more vibrant than ever," and "We are pleased with our progress" were not actionable under § 10(b)); City of Royal Oak Ret. Sys. v. Juniper Networks, Inc., 880 F.Supp.2d 1045, 1064 (N.D. Cal. 2012) (statements that "[b]oth Verizon and AT&T are strong partners," company has "strong demand metrics and good momentum" and "our demand indicators are strong, our product portfolio is robust" are unactionable statements of corporate optimism).

Id. The same result obtains here.

The Ninth Circuit has clearly noted that reasonable investors do not rely on puffery in making investment decisions. Id. (citing Cutera, 610 F.3d at 1111); see also Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002) (" . . . a statement will not mislead even if it is incomplete or does not include all relevant facts"). "[M]ildly optimistic, subjective assessment[s] . . . [do not] amount to a securities violation." Cutera, 610 F.3d at 1111. Woodman's statement is in line with the type of comments courts consistently deem non-actionable. See Fadia, 2016 WL 6679806, at *8 (collecting cases); see also Melot v. JAKKS Pac., Inc., 2016 WL 6902093, at *18 (C.D. Cal. Nov. 18, 2016).

Finally, Plaintiff's allegations about the reduced internal sales forecast are not specific enough to prove any of Defendants' statements false. While Plaintiff alleges generally that

"[b]efore the Hero4 Session was publicly launched in July 2015, the internal sales forecast for the Hero4 Session was reduced," ECF No. 90 ¶ 54(c), Plaintiff does not identify any specific report or state the particular facts available to Defendants that would make any of their statements false.

Defendants correctly point out that Plaintiff did not provide a date for the revised forecast, exactly who received it, how much or in what respects the revised forecast differed from the original forecast, or how the revision to the forecast impacted or related to pricing for HERO4 Session. See ECF No. 94 at 27. Plaintiff has failed to provide any content of the original or revised forecasts that quantifies or clarifies what Defendants knew and when, and how it proves Defendants' statements were false when made. See ECF No. 100 at 10. Unlike in Reese, upon which Plaintiff relies, Plaintiff does not put forth any specific content statements from internal documents, "detailed report[s]" from experts, or a total denial of any problem with Session sales after concrete and specific evidence arose that there was one. See 747 F.3d at 569-70. While Reese provides that "[f]acts demonstrating public interest in the withheld information support its materiality," Plaintiff here does not allege any of the specifics of the allegedly withheld information. Id. at 570. Vague claims of reducing "internal forecasts" are a far cry from the exact numbers put forth in Reese. See ECF No. 90 ¶ 54. As the Ninth Circuit said in Lipton v. Pathogenesis:

> Although plaintiffs refer to the existence of the IMS data and make a general assertion about what they think the data shows, plaintiffs do not allege with particularity any specific information showing that prescription data informed defendants that patient demand for TOBI was flat. Plaintiffs do not mention a specific IMS document relied on by defendants such as a particular IMS report, graph or chart. Nor do they detail with particularity the content of such data. Rather, plaintiffs merely allege that PathoGenesis tracked patient demand using data provided by IMS and that this data supposedly indicated that patient demand was flat. As we held in Silicon Graphics, negative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA. We hold that plaintiffs' allegations of negative internal reports and IMS data are insufficient to demonstrate deliberate or conscious recklessness.

284 F.3d 1027, 1036 (9th Cir. 2002).

Plaintiff next takes issue with Woodman's September 22, 2015 statement that Session's sales were "going really well" and "sales [were] improving as [they moved] towards the holiday

season." ECF No. 90 ¶ 57.  Plaintiff claims this statement was false and misleading because GoPro reduced Session's sales price by $100 only six days later.  Id. ¶¶ 61-62.  Plaintiff contends that "[i]f Session's sales had been as strong as Woodman represented, the Company would not have cut its price."  ECF No. 98 at 16 (citing In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 73 (2d Cir. 2001)).  Plaintiff's argument with regard to Woodman's September 22, 2015 statement suffers from the same deficiencies as the July 22, 2015 statement.  First, Woodman's statement was clearly tempered by its context.[4]  Moreover, in mid-September, Defendant Lazar explained at several investor conferences that "it's a little hard for little old Session here, because it's competing against the top two selling cameras in the world."  ECF No. 94 at 12 (citing Ex. I at 5). Analysts then "noted that those statements 'confirm that Session has been a difficult sell at the same price point of its historically favorite HERO4 Silver model.'"  Id. (citing Ex. J at 1).  Lazar also said that Session would "require more marketing."  Id. (citing Ex. H at 4).  No reasonable investor would rely on Woodman's statement about "improving" sales as a prediction – much less a guarantee – against an impending price cut.  Moreover, Plaintiff does not provide any concrete facts showing that Woodman's statement was objectively false.  For instance, sales could have been slightly up heading into the holiday season, but still not to GoPro's preferred expectations.  A price cut under such circumstances could have served to boost sales even further.  Plaintiff does not present any evidence that an alternate state of affairs is more plausible.  Woodman's September statement is not actionable.

Plaintiff also alleges that on September 22, 2015, Woodman falsely stated that GoPro had not reduced its orders with Ambarella, GoPro's chip supplier.  ECF No. 90 ¶ 58-60.  While the statement is not a model of clarity, it is clear in context that Woodman was not denying that GoPro had reduced its order levels with Ambarella.  Rather, he stated that Ambarella's announcement of

---

[4] A broader look at the quote reveals that Woodman stated "Yeah, it's going really well.  I think that what has thrown people off a bit is that I think maybe the market is expecting it to be GoPro's top selling camera.  And what you need to remember is that Session is an entirely new type of GoPro, entirely new form factor and it is selling against the incumbents, HERO4 Silver and HERO4 Black which are two of the best-selling cameras in the world.  And so to think that Session is going to be a breakaway GoPro, top seller is maybe, you know, you have to remember that we only came out with this product two months ago.  So it's going well and sales are improving as we move towards the holiday season."  ECF No. 100 at 13 (citing Ex. K at 2).

its own bad news was not a perfect indicator for GoPro's business, and he rejected the contention that the holidays would not be as strong based on that alone. See ECF No. 94 at 25; Ex. K at 4-5.[5] He was, in short, refusing to take a position.

Also at issue is Defendants' October 28, 2015 announcement during their quarterly earnings call that, after the first price cut, Session was "selling in line with expectations." ECF No. 90 ¶ 70. Plaintiff argues that Defendants then admitted that Session's sales did not start to meet expectations until after the second price reduction, in December 2015, to half its initial sales price. ECF No. 90 ¶ 91. But the language Plaintiff quotes as support for this argument comes from Plaintiff's complaint, not from a GoPro executive. The brief refers to the statement "Session's sales did not start to meet expectations until after the second price reduction in December 2015," No. 98 at 12 (citing ECF No. 90 ¶ 91), but what Defendant Lazar actually said was, "Since our December price reduction . . . we have seen a strong up-tick in demand for this product." ECF No. 90 ¶ 91. Fairly presented, the second statement does not make the first one false and does not support an actionable claim.

### 2. Statements Regarding GoPro's Pricing Stability

Plaintiff alleges that the following statements were false and misleading:

- On September 9, 2015, Defendant Lazar stated that GoPro "really [hadn't] seen any

---

[5] Woodman's statement, in context, reads as follows:

> Lipton: . . . .. I know the street looks at Ambarella as a tell on GoPro. So when I was on Ambarella's conference call and they come out and they say listen, our wearable camera business is going to be down year over year. What analysts and investors think is, ok, well, GoPro must not be ordering as many chips from Ambarella. The back half, the holidays are not going to be as strong. That is what the read through was. Is that accurate?

> Woodman: That's not accurate. I think that we did a – I can't comment on Ambarella's business, but if you think about when we launched Session and we did our production builds earlier in the year, that's out of cycle with what we've traditionally done for fourth quarter buildups and new product. It doesn't necessarily mean that we're done for the fourth quarter and we don't have new products, but it's very hard to gauge how one company's performance relates to another company's performance because you just you never have all of the information.

Ex. K at 4-5.

15

ASP erosion.  Maybe it's up or down 1% or 2% a quarter type thing, but it never really varies that much because, as you know, we don't really discount.  ECF No. 90 ¶ 55.

- On September 17, 2015, Defendant Lazar stated ASP's "have actually remained pretty steady," that GoPro's customers were "generally less price-sensitive than [customers for] some other products out there," and that he was "actually pretty optimistic that we're in the right price points today.  And the mix will matter.  But, right now, the mix is pretty good."  Id. ¶ 56.

- On October 28, 2015, Defendant Lazar stated that 3Q15 ASP's were flat and GoPro did not experience noticeable pricing pressure during the quarter.  Id. ¶ 70.

Plaintiff argues that these statements were false because GoPro was experiencing pricing pressure, as evidenced by the price cut on September 28, 2015, and that the ASP statements were misleading because they omitted information about the impending downturn in sales.  ECF No. 17 (citing ECF No. 90 ¶ 61-62, 66, 91).  The Court is unpersuaded by Plaintiff's argument for several reasons.  First, Plaintiff presents no evidence that Lazar's statements about price sensitivity and the right price points related to Session in particular and not to GoPro's entire line of products.  In fact, the statements in context show that GoPro was open that it was facing a challenge with Session because the original price point had put it in competition with GoPro's other, best-selling products.  ECF No. 94 at 17 (citing Ex. H at 5).

Second, Plaintiff does not adequately allege that the statements about ASPs were false. Plaintiff attempts to imply falsity by arguing that Session was performing poorly, and then goes on to argue that the statements are misleading because they omitted the fact that ASPs would be down in the future.   But the Court cannot conclude that any reasonable investor would take the statements about past and present ASPs as an objective assurance of future ASP stability.  Plaintiff has not alleged any facts that "directly contradict[]" the earlier statement such that they "may suggest that [the Defendants] had contemporaneous knowledge of the falsity" of their statements. Read-Rite, 335 F.3d at 845.  In fact, Plaintiff concedes that "ASPs were 'relatively flat,'" because "Session's price cut had occurred too late in the quarter to have a substantial effect."  ECF No. 98 at 17.  In sum, therefore, Plaintiff's allegation that Defendants faced pricing pressure for Session does not directly contradict any of Defendants' statements, especially as Defendants themselves

were contemporaneously explaining the challenges the new Session product was facing. ECF No. 94 at 17 (citing Ex. H at 4; Ex. I at 5).

Moreover, the timeline itself between the September price cut and Defendant Lazar's October statement belies any inference of material falsity that would mislead an investor. The September 28 price cut was clearly not a secret to the public. Therefore, the far more likely inference is that Lazar's October statement about price pressure for GoPro as a whole was intended to encompass the obvious price pressure faced by the one product that had experienced a price cut one month earlier. See ECF No. 90 ¶¶ 61-62, 66; see also Provenz v. Miller, 102 F.3d 1478, 1492 (9th Cir. 1996) (explaining, in the "truth-on-the-market" context, that "[i]f the market has become aware of the allegedly concealed information, the facts allegedly omitted by the defendant would already be reflected in the stock's price and the market will not be misled.") (internal citation and quotation marks omitted)). Accordingly, Lazar's October statement is non-actionable.

### 3. Statements Regarding the Health of GoPro's Channel Inventory

Plaintiff also alleges that on July 21, 2015, Lazar falsely stated that "channel inventory levels in the US and abroad look healthy." ECF No. 90 ¶ 48. Plaintiff's only evidence that Lazar's statement was false, however, is a general assertion that the internal forecast circulated before that date showed Session sales would be lower than expected, and that Defendants insisted on building to the inflated forecast anyway. Id. ¶ 54. While Plaintiff states Defendants later admitted "they had identified weak sell-through trends in late July," ECF No. 98 at 18 (citing ECF No. 90 ¶¶ 66-68), this acknowledgement does not obviously conflict with Lazar's mid-to-late July statement. Plaintiff cites to no authority in support of its argument here, and the Court is unconvinced as to its merit.

Defendants concede that HERO4 Session inventory increased during Q3, but GoPro acknowledged that fact on its Q3 2015 earnings call. ECF No. 100 at 10 (citing Ex. M at 7 ("[W]e are heading into a fourth quarter with channel inventory levels that are at our targets, with the exception of Session . . . which are higher.")). Defendants also argue that Plaintiff's assertion that GoPro took a charge for excess HERO4 Session inventory, ECF No. 90 ¶ 88, is incorrect because

the charge was related to excess inventory for discontinued HERO products and not for the new Session. ECF No. 100 at 10, n.5 (citing Ex. P at 6). Lazar's statement concerning channel inventory is not actionable.

### 4.    Class Period Guidance Statements

Plaintiff also alleges that Defendants issued false revenue guidance on July 21, 2015 and October 28, 2015 without a reasonable basis and without meaningful cautionary language. ECF No. 90 ¶¶ 47-48, 65, 69. Defendants' July 21, 2015 statement provided guidance that expected revenue for 3Q15 would be between $430 million and $445 million and non-GAAP EPS would be between $0.29 and $0.32. Id. ¶¶ 47-48. Ultimately, however, Defendants would report 3Q15 revenues of $400 million and EPS of $0.25. Id. ¶ 65. Plaintiff contends that Defendants knew the guidance lacked a reasonable basis when issued because it was based on Lazar's statement that the channel inventory "look[ed] healthy," which Defendants knew to be untrue. Id. ¶ 48. As noted above, Plaintiff's generalized allegations do not support this premise.

Plaintiff also takes issue with GoPro's October 28, 2015 4Q15 guidance, which predicted revenue between $500 million and $550 million and EPS of between $0.35 and $0.45. Id. ¶ 69. Plaintiffs contend that this guidance, "though below expectations, was knowingly false." Id. While Defendants ended up reporting 4Q15 revenues of $435 million and losses per share of $0.25, Plaintiff does not point to any particular facts supporting the contention that "[s]trong Session sales were instrumental to the guidance," and were being knowingly overstated, or that Defendants were in possession of sales forecasts that would render their guidance misleading or false. Id. ¶¶ 88, 90. In short, Plaintiff has not alleged facts that would show Defendants had actual knowledge that GoPro's guidance was false or could not be met when issued.

Defendants also argue that, even if GoPro's guidance was false and misleading because it was not supported by a "reasonable basis," Defendants are immunized by the PSLRA's safe harbor provision for forward-looking statements. ECF No. 94 at 22; 15 U.S.C. § 78u-5(c)(1). Defendants "earning projection[s] [are] by definition" forward looking statements. See Cutera, 610 F.3d at 1111; 15 U.S.C. § 78u-5(i)(1)(A).

Defendants projections fall within the safe harbor "if they were identified as forward-

looking statements and accompanied by meaningful cautionary language, under subsection (A)(i); or if the investors fail to prove the projections were made with actual knowledge that they were materially false or misleading, under subsection (B)." Cutera, 610 F.3d at 1112. If "a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." Id. If a forward-looking statement is "lacking sufficient cautionary language," it may still fall under the safe harbor "where the plaintiff fails to prove actual knowledge that the statement was false or misleading." Id. (citing 15 U.S.C. § 78u-5(c)(1)).

Plaintiff argues that any cautionary statements issued by Defendants were (1) not specific enough, (2) not meaningful, and (3) warning of risks that had already transpired. "[C]autionary statements must be 'precise' and 'directly address[] . . . the [defendants'] future projections." Provenz, 102 F.3d at 1493 (quoting In re Worlds of Wonder Securities Litigation, 35 F.3d 1407, 1412 (9th Cir. 1994)). "Blanket warnings that securities involve a high degree of risk [are] insufficient to ward against a federal securities claim." Id. "Under Ninth Circuit law, if there is a legitimate factual dispute as to whether [] cautionary language is sufficient, then dismissal is not warranted." Westley, 897 F. Supp. 2d at 919.

The Court concludes that GoPro's July 21, 2015 guidance statements are not actionable because, as described above, Plaintiff has not adequately established that Defendant Lazar's statement about channel inventory was knowingly false when made. Plaintiff does not provide any evidence besides the channel inventory statement and the generally described "internal sales forecast" and alleged impending parts cancellations to support any inference that the guidance provided on July 21,2015 was knowingly false when made.

There is also little evidence that the Q4 guidance provided on October 28, 2015 was knowingly false. Unlike in In re Zynga Inc. Securities Litigation, 2015 WL 1382217, at *6 (N.D. Cal. March 25, 2015), on which Plaintiff relies, the Court has not concluded that any of the "statements" Plaintiff puts forth "constitute potentially actionable misrepresentations." Id. Therefore, there can be no "actionable forward-looking statements" "premised upon those alleged

misrepresentations." Id.  Plaintiff itself alleges that the Q4 guidance was disappointing when issued, implying GoPro was accounting for Session's poor performance, and Plaintiff provides no factual allegations to quantify any alleged falsity.  ECF No. 90 ¶ 71.

Even if potentially actionable statements were made, however, Defendants argue that they provided sufficient cautionary statements to immunize themselves under the safe harbor.  In Cutera, cited by both parties, the defendant began the conference call at issue "with a notice that 'these prepared remarks contain forward-looking statements concerning future financial performance and guidance,' that 'management may make additional forward-looking statements in response to [] questions,' and that factors like [the defendant's] 'ability to continue increasing sales performance worldwide' could cause variance in the results." Cutera, 610 F.3d at 1112.  Similarly, here, GoPro provided cautionary language at the beginning of its Q2 and Q3 earnings calls.[6]

_____

[6] On the July 21, 2015 conference call, Defendant Brown stated:

> I would like remind you that statements on this call including, but not limited to, those about our projected future and financial results including revenue and expenses, economic and marketing trends, our future plans, prospects, and growth opportunities, the continued adoption of our products, the anticipated benefits of our long-term strategy, our customers' competitive position, market share and leadership position in various markets constitute forward-looking statements. These forward-looking statements and all other statements that may be made on this call are not historical facts, are subject to a number of risks and uncertainties that may cause actual results to differ materially. These forward-looking statements speak only to today's call, and we do not undertake any obligation to undertake these forward-looking statements. We refer you to our annual report form 10-K for the year ended December 31, 2014, which is on file with the Securities and Exchange Commission. In particular to the section entitled risk factors, and to other reports that we may file from time to time with the SEC for additional information on factors that can cause actual results to differ materially from our current expectations.

ECF No. 90 ¶ 128.  On the October 28, 2015 call, one of the Defendants stated:

> I would like to remind you that statements on this call including but not limited to those about our projected future and financial results, including revenue and expenses, economic and marketing trends, our future plans, prospects and growth opportunities, the continued adoption of our products, the anticipated benefits of our long-term strategy, our customers, competitive position, market share and leadership position in various markets constitute forward-looking statements.

> This forward-looking statements and all other statements that may be made on this call that are not historical facts, are subject to a number of risks and uncertainties

20

Moreover, the defendant in <u>Cutera</u> "affirmatively warned that its ability to compete and perform in the industry depended on the ability of its sales force to sell products to new customers and upgraded products to current customers, and that failure to attract and retain sales and marketing personnel would materially harm its ability to compete effectively and grow its business." <u>Id.</u> Such language was sufficient to establish safe harbor protection. GoPro pointed to similar warnings by, at the beginning of its earnings calls, pointing potential investors to its Form 10-K for the fiscal year which ended December 31, 2014, and the specific risk factors contained therein. <u>See</u> ECF No. 90 ¶ 130. For instance, with respect to the Q4 guidance issued in October, the cautionary language: "If our sales during the holiday season fall below our forecasts, our overall financial condition and results of operations could be adversely affected," "If we fail to effectively manage new product introductions, our revenue and profitability may be harmed," "The success of new product introductions depends on a number of factors . . .," "[I]f we do not successfully manage product transitions, especially during the holiday shopping season, our revenue and business may be harmed," "[A]ny shortfall in expected fourth quarter net sales, due to macroeconomic conditions, product release patterns, a decline in the effectiveness of our promotional activities or supply chain disruptions, or for any other reason, could cause our annual results of operations to suffer significantly," and "our ability to accurately forecast demand for our products could be affected by other factors . . ." Ex. A at 7-10, 13-14; ECF No. 94 at 24.

While Plaintiff contends that GoPro's warnings were not specific enough, the Ninth Circuit has repeatedly held that cautionary language "virtually identical to the cautionary language approved in <u>Cutera</u>" is "sufficient." <u>Police Retirement Sys. Of St. Louis v. Intuitive Surgical, Inc.</u>, 759 F.3d at 1059-60 (9th Cir. 2014). The cautionary language given does not need to warn of the

---

that may cause actual results to differ materially. These forward- looking statements speak only to today's call, and we do not undertake any obligation to update these forward-looking statements. We refer you to our annual report on Form 10-K for the year ending December 31, 2014, which is on file with the Security and Exchange Commission. In particular, to the sections entitled risk factors, and to other reports that we may file from time to time with the SEC for additional information on factors that can cause actual results to differ materially from our current expectations.

ECF No. 90 ¶ 129.

"exact risk" that transpires and causes a company to miss a guidance forecast. See Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc., 2012 WL 685344, at *5 (N.D. Cal. Mar. 2, 2012). The cautionary statements GoPro made are not materially different from those put forth in Cutera or Intuitive Surgical, and they are therefore sufficient.

Plaintiff argues that Defendants' cautionary warnings were inadequate because they warned of risks that had already transpired. ECF No. 98 at 20 (citing In re Harman Int'l Indus., Inc. Sec. Litig., 791 F.3d 90, 102 (D.C. Cir. 2015) cert. denied, 136 S. Ct. 1167 (2016); Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004); In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1178 n.62 (C.D. Cal. 2008)). The Court agrees that "[i]f a company were to warn of the potential deterioration of one line of its business, when in fact it was established that that line of business had already deteriorated . . . its cautionary language" may be inadequate. Harman, 791 F.3d at 102. But the Court also agrees with Defendants that Plaintiff fails to allege facts showing Defendants knew at Session's launch on July 12, 2015, that it could not meet its Q3 2015 guidance announced nine days later, or that Defendants knew GoPro's September 28 price reduction was already so unsuccessful that GoPro could not meet its Q4 guidance announced in October. See ECF No. 100 at 14-15. It is not obvious that Session had already collapsed to the point Plaintiff implies. GoPro had spoken publicly about Session's struggles by October 28, 2015, and the Q4 guidance was, accordingly, disappointing. Thus, the cautionary language could apply to warn of further deterioration from that point forward.

Finally, Plaintiff argues the warnings remained the same despite the changed conditions presented by Session's weak sales, declining price, and channel inventory, and were therefore not meaningful. ECF No. 98 at 21. Because the warnings "were made in the Company's Form 10-K for FY14, filed a full eight months before Session was introduced," Plaintiff alleges, the warnings were "stale." ECF No. 90 ¶¶ 54, 73, 130; ECF No. 98 at 21. Plaintiff's argument is unpersuasive. "[C]autionary language is not rendered insufficient merely because Defendants utilized similar language in their cautionary disclosures throughout the Class Period." In re Quality Systems, Inc. Securities Litigation, 60 F. Supp. 3d 1095, 1107 (C.D. Cal. 2015).

### C. Plaintiff Has Not Adequately Pleaded Scienter

The complaint also fails because Plaintiff's allegations are not sufficient to establish the "strong inference of scienter" required by the PSLRA.

To establish scienter, Plaintiff relies largely on a core operations theory. "The core operations theory posits that 'facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers.'" Knox v. Yingli Green Energy Holding Co. Ltd., No. 2:15-CV-04003 ODWMRWX, ___ F. Supp. 3d ___, 2017 WL 1013293, at *10 (C.D. Cal. Mar. 15, 2017) (quoting S. Ferry LP, 542 F.3d at 783 (9th Cir. 2008)); see also In re Read–Rite Corp., 335 F.3d 843, 848 (9th Cir. 2003). "[A]llegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement" in some circumstances. S. Ferry LP, 542 F.3d at 785. For one, "the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is "cogent and compelling, thus strong in light of other explanations." Id. (quoting Tellabs, 551 U.S. at 323). Also, "such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information." Id. at 786. But the allegations must consist of more than generalities about management's access to data. "Rather, particularity requires pleading the who, what, where, when, and how regarding each Defendant's access to the relevant information that belies fraudulent intent." Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., No. 10-CV-03451-LHK, 2012 WL 1868874, at *19 (N.D. Cal. May 22, 2012), aff'd, 759 F.3d 1051 (9th Cir. 2014). "In the absence of such particularized allegations, the Court cannot ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge" of a lower sales forecast, or equally importantly, whether that forecast was sufficiently lower to render their statements false or deliberately misleading. Id. (citations and quotations omitted).

Moreover, viewing the scienter allegations holistically, Matrixx, 563 U.S. at 48, there are facts that cut against a finding of scienter. For one, there is no allegation of improper stock sales by any individual defendant during the class period. "While 'the absence of a motive allegation is not fatal,' it may significantly undermine a plaintiff's theory of fraud." Cement Masons &

Plasterers Joint Pension Trust v. Equinix, Inc., No. 11-01016 SC, 2012 WL 685344, at *8 (N.D. Cal. Mar. 2, 2012) (quoting Tellabs, 551 U.S. at 325). For another, GoPro actually repurchased shares during the class period. This further undercuts a finding of intent, "since it is illogical that [GoPro] would have been repurchasing its shares had it been aware of facts that would indicate the price would fall." In re Cisco Sys. Inc. Sec. Litig., No. C 11-1568 SBA, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013); see also In re Nvidia Corp. Securitites Litig., No. 08-CV-04260-RS, 2010 WL 4117561, at *11 (N.D. Cal. Oct. 19, 2010) ("NVIDIA actually repurchased shares during the Class Period through a previously announced stock repurchase plan").

Viewed together, Plaintiff's allegations do not support a strong inference of scienter. See Zucco Partners, 552 F.3d at 1007 (affirming dismissal where scienter allegations, viewed holistically, were "not as cogent or compelling" as plausible non-fraudulent alternative). Rather, "[c]onsidered holistically, Plaintiffs' allegations do not overcome the competing inference that Defendants simply miscalculated the demand for a new product." Fialkov v. Microsoft Corp., 72 F. Supp. 3d 1220, 1234 (W.D. Wash. 2014).

### D. Plaintiff's Claim Against Defendant Bates

Defendants argue that Plaintiff's claim against Defendant Bates "fails for an independent reason: Plaintiff has not alleged that he made any allegedly false or misleading statement." ECF No. 94 at 31. Defendants correctly note that Section 10(b) reaches only a person who "make[s] any untrue statement of a material fact" in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5(b); Janus Capital Group, Inc. v. First Deriv. Traders, 564 U.S. 135, 141 (2011).

Plaintiff's response to this argument is contained in a footnote at the end of its opposition, where it writes,

> Defendants contend that Plaintiff fails to state a §20(a) claim solely because it fails to state a §10(b) claim. Mot. at 25. Thus, whether Plaintiff stated a §20(a) claim is wholly derivative of the Court's §10(b) determination. Bates is liable for control person violations under §20(a) as to the misrepresentations made on the July 21, 2015 and October 28, 2015 earnings calls. In re Gilead Scis. Sec. Litig., 2009 U.S. Dist. LEXIS 95072 at *18-19 [2009 WL 3320492, at *5] (N.D. Cal. Oct. 13, 2009); ¶¶29, 31-32, 43, 48, 66, 149-150.

ECF No. 98 at 33 n.18. As set forth above, the Court has concluded that as currently pleaded, the

July 21 and October 28 statements are not actionable.  Thus, any control person allegation against Bates necessarily fails.  See, e.g., Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir. 1996) ("To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed").

### E.     Plaintiffs' Derivative Section 20(a) Claim

Section 20(a) of the Exchange Act, which forms the basis of Plaintiffs' second cause of action, extends liability to persons who directly or indirectly control a violation of the securities laws.  15 U.S.C. § 78t(a).  To adequately establish a claim that individual defendants are "controlling persons" of a company, a plaintiff must allege (i) that the individual defendants had the power to control or influence the company, (ii) that the individual defendants were culpable participants in the company's alleged illegal activity, and (iii) that the company violated the federal securities laws.  In re Silicon Storage Technology, Inc., 2006 WL 648683, at *3 (citing Durham v. Kelly, 810 F.2d 1500, 1503-04 (9th Cir. 1987); Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000)).

A claim under section 20(a) can only survive if the underlying predicate Exchange Act violation also survives.  See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).  Because the Court dismisses Plaintiff's Exchange Act claim, Plaintiff's second cause of action must also be dismissed.

### CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss without prejudice.  Plaintiff may file an amended complaint within 21 days.

IT IS SO ORDERED.

Dated:  May 1, 2017

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California